STATE of Minnesota, Respondent,

v.

William Nathaniel HARRIS, Appellant.

No. C9–86–1841.

Court of Appeals of Minnesota.

June 9, 1987.

Review Denied July 31, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Jonathan Steinberg, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and WOZNIAK, and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Appellant William Harris was convicted of attempted murder in the first degree, Minn.Stat. §§ 609.185(1), 609.17 (1984), assault in the first degree, Minn.Stat. §§ 609.221, 609.11 (1984) and two counts of assault in the second degree, Minn.Stat. §§ 609.222, 609.11 (1984). This appeal challenges the admission of his confession, the alleged destruction of two photographs, the denial of a new trial based on the recanted testimony of the victim and the upward departure from the presumptive sentence. We affirm.

## FACTS

LaDonna Stuhr, age 22, had worked as a prostitute since she was 11 years old. When she was 13 she met appellant, now age 54, and fell in love with him. She continued working as a prostitute and gave appellant the money she earned. She was the mother of their two children, age 3 and 5, and lived with him during most of their nine year relationship. In 1981 she was hospitalized as a result of a beating by appellant.

The evening of March 30, 1986, appellant discovered Stuhr in bed with Kim Amyx, a friend and prostitute. Stuhr testified that appellant became angry and knocked her around. Stuhr left the residence.

Appellant, Lori Johnson, appellant's live-in friend and babysitter, and the children

were soon evicted and they lived at the Royal Crown Motel in Crystal, Minnesota from April 3rd to the 7th and April 10th to the 13th. After March 30 Stuhr's mother received a number of phone calls from appellant attempting to get in touch with Stuhr.

Stuhr arranged to meet appellant during the evening of April 12 but did not show up. She denied going to a stag party that night. Around noon on April 13 Stuhr and a friend of Amyx drove to the Royal Crown Motel to meet appellant. Stuhr testified she went there to get her children since she feared appellant would leave the state with them. Appellant was packing things into his car.

Stuhr entered the motel room and appellant followed her in, closing the door. Johnson and the children were also inside. Stuhr picked up one of her children and was immediately struck in the back of the head with a two foot long object. She was struck all over her body.

Stuhr testified something wet came on her, she smelled gasoline, heard a gurgling sound for five to six seconds, and remembered nothing until she awoke in the hospital.

Amyx's friend saw appellant, Johnson and the children leave by car. The children were kneeling looking out the back window towards the motel. Stuhr was on the ground outside the motel, beaten and badly burned. The motel room door was open and black smoke was rolling out the door. The motel room was destroyed by fire.

The next day appellant was arrested and he agreed to give a statement. He stated that Stuhr arrived at the motel with a "trick". He claimed she wanted the children back and he became upset and struck her with an oak stick. He claimed Stuhr first flipped a small carpet knife at him but he had no visible injury or mark, and no such knife was ever found. He stated after striking her he poured gasoline on Stuhr from a pop bottle and lit her on fire with a Bic lighter. He acknowledged that Johnson and the children were present.

When asked what precipitated the events appellant said that Stuhr had worked at a stag party the night before and showed him photographs of herself in sexual acts with another man. Appellant also stated Stuhr had said she was intrigued by the woman appellant had caught her in bed with and that Stuhr intended to take the children away.

Appellant admitted striking Stuhr six or seven times saying "I just kept hitting her." He also admitted that after he lit her on fire she asked for help and he replied, "Get your God damn trick to help you." Appellant's statements were admitted at trial.

Stuhr suffered two skull fractures, jaw fractures, rib fractures, a broken arm, a broken leg, a collapsed lung, a lacerated liver and contusions to the kidneys. She was burned over 28 percent of her body and lost an ear and a breast. Her face, chest, arms and hand were severely burned and are permanently disfigured. She has a permanent drop foot causing her to limp when she walks. She lost permanent use of one arm and a hand. She has had 14 surgeries, including five skin grafts. In addition, she will have to undergo several more surgeries and skin grafts. A doctor testified there is no end to the surgery she would need.

Investigators recovered a tire iron and a burned oak stick from the motel room as well as several lighters and broken glass. Medical testimony indicated that many of Stuhr's wounds were eccentric in shape (half circle) about one inch in diameter and were consistent with a beating from the tire iron recovered from the motel room. Stuhr testified the tire iron felt like the object used in the attack.

Appellant was charged with attempted murder in the first degree, assault in the first degree and two counts of assault in the second degree. At trial appellant did not testify. He chose to be tried in absentia after the State's first witness testified. Appellant was convicted as charged and sentenced to 240 months imprisonment for attempted murder, an upward departure from the presumptive 70-month sentence

recommended by Minnesota Sentencing Guidelines.

## ISSUES

1. Was appellant's confession admitted in violation of his Fifth and Sixth Amendment rights?

2. Is appellant entitled to reversal of his convictions because of the intentional destruction of photographs?

3. Did the trial court abuse its discretion in denying appellant a new trial based on alleged recantation of the victim's testimony?

4. Did severe aggravating circumstances justify the 3.4 upward departure?

5. Did appellant receive effective assistance of counsel?

## ANALYSIS

### I.

Appellant contends his confession was taken in violation of his Fifth and Sixth Amendment rights.

1. At the omnibus hearing, Detective Richard Gautsch testified that after appellant's arrest, he did not appear to be under the influence of any chemicals or alcohol. He testified that appellant was read his *Miranda* rights and that appellant stated he understood the rights and agreed to speak.

Appellant testified at the omnibus hearing that he was not read his rights and stated that Gautsch threatened to beat him. He also claimed another officer hit him in the mouth when he was booked and that he was in pain when he talked to Gautsch. The officers involved specifically denied appellant's claims.

"Statements made by an accused during custodial interrogation may be admitted at trial only if he or she was properly informed of constitutional rights, has knowingly and intelligently waived the privilege against self-incrimination, and has made the statements freely and voluntarily." *State v. Andrews*, 388 N.W.2d 723, 730 (Minn.1986).

■ The State established that the *Miranda* warning was given and that appellant stated he understood his rights. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Because appellant testified to the contrary, the trial court acted as a finder of fact. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). Conflicting claims create credibility issues which the trial court must resolve. *State v. Ture*, 353 N.W.2d 502, 512 (Minn.1984). The trial court apparently believed the police officers and this choice is supported by the circumstances. The State also established that appellant's statements were voluntary, notwithstanding appellant's claim that he was in pain. We conclude that appellant's statements were made after being fully advised of his rights, that he understood them and that he made a knowing, intelligent and voluntary waiver.

2. Appellant raises two arguments with respect to his claim that the confession was in violation of his right to counsel. First he claims he asked for an attorney at the beginning of the interrogation. This claim, however, is contrary to Detective Gautsch's testimony. Given the trial court's rulings, which assume that Gautsch was a more credible witness than appellant, this contention is clearly without any factual support. *See Ture*, 353 N.W.2d at 512.

Appellant also argues that near the end of the interview he asked for an attorney. He contends that anything said after this point should have been suppressed. Gautsch testified he asked about appellant's criminal history and appellant replied he spent eight years, four months and 11 days in Lansing, Kansas penitentiary and then stated, "I want to talk to a lawyer now if you are going to start getting into that stuff from the past." Gautsch changed the subject. The remaining interrogation consisted of appellant's statements that he wasn't interested in Stuhr's condition, how he acquired the oak stick, the strength of the stick, and his denial of using a tire iron.

■ Arguably appellant's statement was not a clear invocation of his right to coun-

sel since it appears to be conditioned only on further questioning about his prior record and no further questions about his prior record were asked. *See State v. Campbell,* 367 N.W.2d 454, 459 (Minn. 1985). Even if appellant had invoked his right to counsel, admission of appellant's subsequent statements was harmless error. His references to the strength of the oak stick were not prejudicial inasmuch as appellant had already admitted using a thick stick. Also, given the physical evidence (a stick and tire iron were recovered from the scene and admitted into evidence) the medical evidence (Stuhr's injuries were more consistent with being struck by a heavy metal object such as a tire iron) and Stuhr's testimony, appellant's comments about the strength of the stick was harmless. *See Muhammed v. State,* 316 N.W.2d 572, 574 (Minn.1982).

## II.

Appellant claims the police intentionally destroyed material defense evidence consisting of two sexually explicit photographs he had in his wallet. He claims the photos were relevant to his state of mind because they allegedly depicted Stuhr at a stag party the night of April 12 and were shown to appellant the day of the offense. Stuhr vehemently denied attending a stag party that night.

The record established that two sexually explicit photos of Stuhr were removed from appellant's wallet at booking, but that the property inventory sheet did not list the photos or wallet. Consequently they were both misplaced. Two photos were later recovered from appellant's property basket at the jail. Appellant was the only person who claimed the two photos were not the photos he had in his possession. Appellant claimed at the omnibus hearing the recovered photos were taken from his car. From our review, appellant has not shown the police intentionally destroyed the two sexually explicit pictures he claimed he had in his wallet.

Even if the photos recovered were not the photos appellant allegedly had in his wallet, we would not reverse appellant's convictions. Several factors must be weighed in determining whether the destruction of evidence necessitates a reversal of conviction: (1) whether the destruction was intentional; (2) the strength of the State's case even if the evidence was available; and (3) the possible exculpatory value of the lost or destroyed evidence. *California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984); *State v. Nelson,* 399 N.W.2d 629, 633 (Minn.Ct.App.1987).

At best any loss was due to negligent inventory practices at the jail, not intentional destruction of evidence. The evidence was overwhelming against appellant, even if the claimed photos were available. Finally, the exculpatory value of the photos was questionable since the jury was told what the photos depicted through admission of his statements upon arrest. It also strikes this court as somewhat odd the contention that appellant became emotionally upset upon seeing the alleged photographs. Stuhr worked as a prostitute for years and appellant not only knew this, but he profited from her endeavors. The fact that he claimed the photos actually recovered were taken from his car, indicating that appellant had seen Stuhr in sexually explicit photographs before, essentially cuts against his entire argument that he became incensed upon seeing the photos.

## III.

Appellant claims he is entitled to a new trial based on the alleged recanted testimony of the victim. After release from the Burn Unit Stuhr stayed at her mother's where she was depressed and suicidal. She wrote to appellant to determine why he set her on fire. Appellant wrote back and, apparently for the first time, told her he loved her. He wrote her several more letters, including a letter which appears to be advocating Stuhr to state that the gasoline was accidentally spilled on her and that it was accidentally ignited from an explosion. Stuhr drafted a statement which was sent to appellant, appellant's trial attorney and the trial court judge. This statement read:

To all it may concern. My memory has come back to me and I remember what happened the 13th of April, 1986. I went to the motel to get the children and William Harris did not want to release custody, got into an argument over it. Through the fighting, gasoline got spilled on me by accident, not by Mr. William Harris. There was an explosion that caused it to light. William Harris did not cause the fire either. William did not hit me either. It was just a misunderstanding between us. I do not believe he should be punished for something that was an accident. I will be the one that will be hurt again if he goes to prison. It was an accident. What more do you want?

In pretrial proceedings Stuhr failed to appear in court pursuant to a subpoena but later did appear and testified at trial, albeit somewhat reluctantly. The correspondence between her and appellant was admitted.

After appellant was convicted, defense counsel moved for a new trial based on recanted trial testimony as expressed by Stuhr in a post-trial letter sent to the trial court judge. This motion was denied and is the basis for appellant's contention on appeal.

It is highly questionable if the post-trial letter is indeed a recanting of Stuhr's trial testimony or whether it is simply a plea for mercy. The letter reads:

Aug. 86

Judge Durda,

Hi, how you doing? I am writting you in regards of a man's life. Mr. William Harris life. You no I didn't want to testifie, but I was threaten about going to jail. And I had to say what my statement said. My statement, not all is true. You have to understand I was hurt and bitter at the time so I said things that I new he couldn't get off on. The fire was an accident. I throw alot of things when I get mad. I didn't no there was gasoline in that bottle when I threw it. I've been threaten about the kid's being taken away from me. So I had to say what everyone wanted me to say. Not what

happened. But we are talking about a man's life. We were together nine years your honor. I no he would never try and kill me. We were fighting for our children. And the children mean alot to him like they do to me. We each wanted them and this is what happened. Love for a child is strong for most people you no. He's only hurt me a few times. But they were good reasons. Like the time I started on drugs. He was only trying to show me the good from the bad. He's always been good to me and our children. He never forced me to work in the job I did. He didn't like it really. But it was the only job I new that made enuff money to satisfie myself. And he took care of us when I didn't want to. We were a family your honor. Just because he's black and I am white should of never been judged. You no in your heart this hole thing was very unfair toward him. I can see assault, but not no murder! Everybody made it a big fact because I was burned. And he's black and I am white. But rember I was with the man for nine years. I no him better than anyone else. So I am begging you on my hands and knees this day in the presence of God to forgive that man. Not that I would ever go back if I could, but it will *kill* him if you give him *more* than the minnimum. So I am begging you to give him the least amount of time that you can. You can do what you want, not what everybody want's you to do. "Please" your honor I beg of you! The man is a good man. Plus he shouldn't be going if I didn't want him to. I should of had the choice to press charges if I wanted to. Well it's up to you if he dies or lives. Make a wise choice I beg of you! This was my fault to you no. Not just his. I still love the man and always will.

Even if it were construed as recanted trial testimony, the general rule is that a trial court should not grant a new trial based on recanted trial testimony unless the court is reasonably certain the recantation is genuine. *State v. Walker*, 358 N.W.2d 660, 661 (Minn.1984). Courts view recanted testimony with suspicion because

of the possibility that it was obtained through coercion. *State v. Caldwell,* 322 N.W.2d 574, 585, n. 7 (Minn.1982).

■ A trial court may grant a new trial based on recanted testimony if a.) the court is reasonably well satisfied the testimony given by a material witness is false; b.) that without it the jury might have reached a different conclusion; and c.) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial. *Caldwell,* 322 N.W.2d at 584–85.

■ Under all the circumstances of this case the trial court did not abuse its discretion in denying appellant a new trial based on the alleged recantation of the victim's testimony. The trial court could reasonably conclude that Stuhr's trial testimony was not false, that the jury would have reached the same conclusion even without her testimony, and that the post-trial letter was substantially the same as her pretrial letter anyway and was likely the product of coercion.

### IV.

Appellant was sentenced for attempted murder in the first degree to 240 months, the statutory maximum for this offense. The presumptive guidelines sentence was 70 months. Appellant challenges the upward departure which was based on the extreme violence and cruelty of the crime, appellant's lack of remorse, the infliction of permanent injury and the fact that the victim's children were present during the offense.

■ When aggravating factors justifying more than a double departure are present the only absolute limit on sentence duration is that provided by the legislature. *State v. Mortland,* 399 N.W.2d 92, 94, n. 1 (Minn.1987). The record here establishes that there were severe aggravating circumstances.

Appellant inflicted particular cruelty in repeatedly beating the victim, and then dousing her with gasoline and setting her on fire. *See* Minnesota Sentencing Guidelines II.D.2.b(2); *State v. Schantzen,* 308 N.W.2d 484, 487 (Minn.1981) (gratuitous infliction of pain qualifies as "particular cruelty"). Appellant inflicted multiple blows causing two skull fractures, a broken arm, a broken leg, broken ribs, a lacerated liver, a collapsed lung and numerous cuts on her face and scalp. The act of pouring gasoline on the victim and lighting her on fire is so cruel it is almost beyond belief. This alone would justify the departure in this case.

Appellant also failed to help the victim after he set her on fire, telling her to "Get your God damn trick to help you." This also demonstrates particular cruelty and has been cited by the supreme court as an aggravating factor. *See State v. Jones,* 328 N.W.2d 736, 738 (Minn.1983).

Appellant also inflicted permanent injuries and lifelong disfigurement on the victim. Stuhr suffered the loss of an ear, the loss of a breast, permanent loss of use of one arm and hand, a permanent drop foot causing her to limp, and permanent disfigurement of her face, chest, arms and hand. *See State v. Udstuen,* 345 N.W.2d 766, 768 (Minn.1984).

Finally, appellant committed the crimes in the presence of the victim's young children, age three and five. *See State v. Profit,* 323 N.W.2d 34, 36 (Minn.1982). Both children have been in psychological counseling since the incident. We conclude that there were severe aggravating circumstances in this case justifying the 240–month sentence.

### V.

Appellant submitted a pro se brief on appeal, claiming he should have been able to choose an alternative court-appointed counsel and that he received ineffective assistance of counsel. A direct appeal is not the most appropriate way of raising these issues. *State v. Hanson,* 366 N.W.2d 377, 379 (Minn.Ct.App.1985). Instead, the issues should be raised in a post-conviction proceeding, allowing for review of facts regarding why defense counsel did or did not do certain things. *Id.*

Regarding appellant's first claim, it is well-established that a defendant does not have the right to obtain court-appointed counsel of his choice. *State ex rel. May v. Swenson,* 242 Minn. 570, 572, 65 N.W.2d 657, 659 (1954). The defendant may request a substitution, but this request will only be granted in cases of exceptional circumstances and when the demand seems reasonable. *State v. Carey,* 296 Minn. 214, 222, 207 N.W.2d 529, 533 (1973). Additionally, the court may in its discretion deny last-minute requests for substitute counsel which inevitably delay trial. *Id.* Here, appellant requested substitute counsel only 18 days before trial and there were no exceptional circumstances to justify the request.

Appellant also claims he was denied effective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel appellant must show that trial counsel was not reasonably effective and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Defense counsel was effective at trial and there is no reasonable probability that the result of the proceeding would have been different had appellant been represented by a different attorney.

## DECISION

Appellant was not denied a fair trial and his confession was made after a valid waiver of Fifth and Sixth Amendment rights. The trial court did not abuse its discretion in denying a new trial based on the alleged recanting of the victim's testimony and the court did not abuse its discretion in sentencing appellant to 240 months imprisonment, the statutory maximum for attempted murder in the first degree. Appellant received effective assistance of counsel.

Affirmed.