STATE of Minnesota, Appellant,

v.

David Gustave HAWKINSON, Respondent.

Nos. A11–1565, A11–1819.

Supreme Court of Minnesota.

April 24, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; and Alina Schwartz, Assistant Plymouth City Attorney, Samuel J. Edmunds, Campbell Knutson, P.A., Eagan, MN, for appellant.

Peter J. Timmons, Attorney at Law, Minneapolis, MN, for respondent.

William A. Lemons, Saint Paul, MN, for amicus curiae Minnesota County Attorneys Association.

OPINION

ANDERSON, PAUL H., Justice.

The State charged David Gustave Hawkinson with several misdemeanor offenses, including driving a motor vehicle with a blood-alcohol concentration of 0.08 or more. Hawkinson pleaded not guilty and moved to suppress the results of his blood-alcohol test. The Hennepin County District Court granted Hawkinson's motion to suppress the evidence and the State filed a pretrial appeal. In a published opinion, the Minnesota Court of Appeals affirmed the district court's suppression order. *State v. Hawkinson,* 812 N.W.2d 201, 205 (Minn.App.2012). In essence, the court of appeals adopted a per se rule requiring suppression when the State destroys evidence after a defendant has made a demand to preserve the evidence. *Id.* at 203–05. The State petitioned for review and asks us to determine the standard a district court must apply when considering whether to admit the results of a blood test in a misdemeanor driving-while-impaired (DWI) case when the State has destroyed a blood sample in accordance with its retention policy, but after the defendant has filed a request to preserve "blood tests." We reverse.

In the early hours of March 20, 2010, a City of Plymouth police officer stopped respondent David Gustave Hawkinson, who was driving a sport-utility vehicle. Hawkinson was arrested on suspicion of DWI. Hawkinson was given an "Implied Consent Advisory" and offered the opportunity to take a blood test. Hawkinson consented to the test and was then driven to North Memorial Hospital in Maple Grove, where a blood sample was taken at approximately 3:40 a.m. The Minnesota Bureau of Criminal Apprehension (BCA) tested Hawkinson's blood sample and issued a report on April 8, 2010. The BCA report indicated that, when the blood sam-

ple was drawn, Hawkinson had a blood-alcohol concentration of 0.11 grams per 100 milliliters of blood, a concentration that exceeded the 0.08 legal limit in Minnesota. *See* Minn.Stat. § 169A.20, subd. 1(5) (2012). The State charged Hawkinson with several misdemeanor offenses, including driving a motor vehicle with a blood-alcohol concentration of 0.08 or more.

On June 10, 2010, Hawkinson served a "Demand for Disclosure and Discovery and Demand for Preservation of All Evidence by Defendant" on the State. Hawkinson's letter included a request to preserve "blood tests." The relevant passage of the letter reads as follows:

> Defendant, by his counsel, hereby demands that the prosecution preserve and maintain all evidence that may have been obtained by and about Defendant herein including, but not limited to, the following items: police squad car video tapes, Implied Consent Advisory video and/or audio tapes, jail or law enforcement centers security tapes, *blood tests,* urine tests, photographs, all statements of any and all alleged witnesses herein in both video and audio form, computers, computer hard drives, computer software, and any and all other scientific tests, test[ ] examinations, documents, recordings, and all other evidence normally obtained by or about Defendant herein in any manner or form under the direction, care, custody, or control of law enforcement and the prosecution herein.

(emphasis added). The State did not forward Hawkinson's request to the BCA.

On July 12, 2010, Hawkinson sent the BCA a letter requesting information relating to Hawkinson's prosecution, including test reports, test records, information sheets, chain-of-custody logs, and quality reports. On August 10, 2010, the BCA e-mailed a copy of the requested documents to both Hawkinson and the State, including the BCA's April 8, 2010 report. The report contained a statement that Hawkinson's blood sample would be "destroyed by the laboratory twelve months following the date of this report." The BCA subsequently destroyed Hawkinson's blood sample.

On September 10, 2010, Hawkinson moved to suppress the results of the blood test and to dismiss the charges against him on the grounds that the Implied Consent Advisory given to him was misleading and coercive, and that a search warrant was required before a blood sample could be drawn and tested. The district court ruled against Hawkinson.

On August 25, 2011, over 16 months after the BCA completed its April 8, 2010 report, Hawkinson telephoned the BCA to inquire about the status of his blood sample. The BCA informed Hawkinson that the blood sample had been destroyed. The same day that Hawkinson requested this information, he filed a motion with the district court requesting the suppression of the blood-test evidence. On August 29, 2011, the court conducted a hearing on Hawkinson's motion to suppress. Ruling from the bench, the court found that the blood sample "could be exculpatory" and suppressed the blood-test results. On October 5, 2011, the court issued its "Findings of Fact, Conclusions of Law, and Order to Suppress Blood Test" that explained the August 29th bench ruling. In its written findings, the court stated that the blood-test results were suppressed because: (1) Hawkinson had been denied his right to due process; (2) the destruction of the blood sample violated Hawkinson's Confrontation Clause rights; and (3) the failure to preserve the blood sample was a violation of the "Minnesota criminal discovery process."

The State appealed. The court of appeals affirmed the district court's conclu-

sion that the destruction of the blood sample violated Hawkinson's right to due process, but did not reach the Confrontation Clause or the "right to [Minnesota] criminal discovery procedure" issues. *Hawkinson*, 812 N.W.2d at 203 n. 1. The State appealed to our court "seek[ing] review of the district court's order suppressing the blood test result and the Court of Appeals' affirmance." The State raises three issues on appeal: (1) whether the district court erred in granting Hawkinson's motion to suppress on due process grounds; (2) whether Hawkinson's cross-examination rights under the Confrontation Clause extend to physical evidence; and (3) whether the destruction of the blood sample violated the Minnesota Rules of Criminal Procedure.

## I.

We first consider whether the district court erred when it granted Hawkinson's request to suppress the results of the blood test on due process grounds. The State asserts that to find a due process violation stemming from the destruction of evidence, we apply a two-step test. First, the defendant must show that the exculpatory value of the evidence was apparent and material, and second, that the potentially exculpatory evidence was destroyed in bad faith. The State asserts that this two-step test has not been met by Hawkinson because the blood sample had no apparent or material exculpatory value and there was no bad faith involved when the BCA destroyed the sample.

Hawkinson argues, and both the district court and court of appeals agreed, that because there was a pending request to preserve Hawkinson's blood sample, the State's destruction of the sample functioned as a per se violation of Hawkinson's right to due process. In essence, Hawkinson states that the destruction of the blood sample "was a denial of due process of law in and of itself." Alternatively, Hawkinson argues that "[e]ven if the 'standard due process' analysis" is used, he was denied due process because the blood sample had value to Hawkinson and the State showed bad faith when it destroyed the sample. In pressing his due process arguments, Hawkinson relies heavily on *State v. Krosch*, 642 N.W.2d 713 (Minn.2002), and *State v. Traylor*, 656 N.W.2d 885 (Minn. 2003). Both cases involved the right to due process, but neither involved lost or destroyed evidence. As such, we conclude that neither *Krosch* nor *Traylor* are relevant to the issues in this case.

In *Brady v. Maryland*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (emphasis added). *Brady* established the broad principle that the State cannot withhold or suppress evidence that is materially favorable to criminal defendants without risking a violation of the Due Process Clause. *Id.*

But the Supreme Court has subsequently clarified *Brady* by narrowing the types of evidence covered by the rule articulated in *Brady*. Specifically, in *California v. Trombetta*, the Court held that breathalyzer-test results could be admitted as evidence against the accused in the State's case-in-chief, even though the actual breath samples had been destroyed. 467 U.S. 479, 491, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The Court explained that, "[a]lthough the preservation of breath samples might conceivably have contributed to [the defense], a dispassionate review . . . can only lead one to conclude that the chances are extremely low that preserved

samples would have been exculpatory." *Id.* at 489, 104 S.Ct. 2528. The Court further explained that, once the initial results indicated intoxication, the "samples were much more likely to provide inculpatory than exculpatory evidence." *Id.* The Court therefore held that the Due Process Clause did not require retention of such likely inculpatory evidence, *id.* at 491, 104 S.Ct. 2528, and that the evidence sought to be excluded "must . . . possess an exculpatory value that was *apparent* before the evidence was destroyed," *id.* at 489, 104 S.Ct. 2528 (emphasis added).

In *Arizona v. Youngblood,* the Supreme Court added a bad-faith component to the analysis in cases where the evidence destroyed by the State lacks apparent and material exculpatory value. 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The Court held that when evidence that is only potentially useful to a defendant is destroyed, a defendant is denied due process only if he can show bad faith on the part of the State. *Id.* In *Youngblood,* the State negligently failed to refrigerate evidence in a child-molestation case and the State's negligence led to the evidence being destroyed. *Id.* at 52–54, 109 S.Ct. 333. The Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333. It is true that the *"potentially useful evidence"* discussed in *Youngblood* can be evidence "which might have exonerated the defendant" and therefore possesses some exculpatory value. *Id.* at 57–58, 109 S.Ct. 333. Thus, it becomes evident that when considering a defendant's due process rights, the destruction of two categories of evidence can give rise to a due

process violation: evidence that has apparent and material exculpatory value—so-called *Brady* evidence, and "potentially useful evidence" described by *Youngblood.*[1]

Our court has previously applied *Youngblood's* bad-faith standard for determining whether the destruction of evidence violates a defendant's right to due process. *See State v. Nissalke,* 801 N.W.2d 82, 110 (Minn.2011) (applying rationale from *Youngblood*); *State v. Jenkins,* 782 N.W.2d 211, 235–37 (Minn.2010) (same); *State v. Bailey,* 677 N.W.2d 380, 393 (Minn.2004) (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333). Thus, the two relevant questions before us are: (1) Is the rule from *Brady* applicable because the destroyed evidence had apparent and material exculpatory value? And, (2) if not, was the evidence potentially useful and destroyed by the State in bad faith?

A. Did the Destroyed Evidence Have Apparent and Material Exculpatory Value?

■ The Supreme Court has held that evidence will not be considered to have apparent and material exculpatory value under *Brady* when "no more can be said than that [the evidence] could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333. We have held that, in a destruction-of-evidence claim, we consider whether the exculpatory value of lost or destroyed evidence was apparent and material before the evidence was destroyed. *Jenkins,* 782 N.W.2d at 235 (quoting *State v. McDonough,* 631 N.W.2d 373, 387 (Minn.2001)); *see also Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528.

---

1. There is a potential third category of evidence—useless or irrelevant evidence—that is not included in either category.

In the current case, Hawkinson's blood sample was tested under the BCA's normal testing procedures. The test results showed that when Hawkinson's blood sample was drawn he had a blood-alcohol concentration of 0.11. In making its ruling, the district court found that the blood sample "*could* be exculpatory." (emphasis added). Hawkinson does not assert that the BCA's testing procedures or test results were in any way faulty. It also appears that Hawkinson did not plan to conduct any additional testing of the blood sample. Further, Hawkinson did not assert and has not presented any evidence that the blood sample was apparently exculpatory, or that the evidence had more than the mere potential to be useful to him.

Given the facts in the record and the district court's findings, the BCA's destruction of Hawkinson's blood sample presents a circumstance very similar to the situation in *Trombetta.* The most that can be said about Hawkinson's blood sample is that there is a chance that more tests on the sample might have proven that the sample—which appeared inculpatory—was in fact exculpatory. *See Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528 (holding that breath samples did not possess apparent exculpatory value because, while the samples might have contributed to the respondent's defense, the chances were extremely low that the samples would have been exculpatory). But the Supreme Court has expressly indicated that there must be something beyond mere "hope" that the destroyed evidence could be exculpatory before it will be protected as the "material exculpatory evidence addressed in *Brady.*" *Illinois v. Fisher,* 540 U.S. 544, 548, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004). Here, the State had already tested the evidence and found that the evidence inculpated Hawkinson; thus, there was no apparent or material exculpatory value and

only a mere hope of exculpatory potential. For the foregoing reasons, we conclude that the blood sample in this case is only "potentially useful evidence," and, therefore, its destruction "does not constitute a denial of due process of law" absent a showing of bad faith. *See Youngblood,* 488 U.S. at 58, 109 S.Ct. 333.

### B. Did the State Destroy the Blood-Sample Evidence in Bad Faith?

 Having concluded that the destroyed .evidence was merely potentially useful evidence, we must take the additional step in our analysis and make a determination of whether the State acted in bad faith when it destroyed Hawkinson's blood-sample evidence. We have held that bad faith requires an intentional act and that in evaluating that act we consider " 'whether there is any evidence that the State destroyed or released the evidence to avoid discovery of evidence beneficial to the defense.' " *Nissalke,* 801 N.W.2d at 110 (quoting *Jenkins,* 782 N.W.2d at 235). The defendant carries the burden of demonstrating bad faith. *See Jenkins,* 782 N.W.2d at 237 ("We hold that [the defendant] has not shown bad faith on the part of . . . the BCA. . . .").

### 1. The State's Purpose and the Impact of Normal Practice and Procedure

The Supreme Court and our court have previously identified two indices of bad faith: (1) whether the State purposefully destroyed evidence favorable to a defendant so as to hide it, *see Youngblood,* 488 U.S. at 56–57 & n. *, 109 S.Ct. 333; and (2) whether the State failed to follow standard procedures when it destroyed the evidence, *see State v. Ture,* 632 N.W.2d 621, 626, 629 (Minn.2001) (affirming the district court's finding that there was no bad faith by noting the police's compliance with

standard procedures helped demonstrate a lack of ulterior motives).

▮ The State's incentive to hide, suppress, or destroy evidence favorable to a defendant is one factor we consider when assessing the presence of bad faith. " 'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' " *Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. 333; *see also State v. Heath,* 685 N.W.2d 48, 56 (Minn.App.2004) (quoting *Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. 333). Thus, the bad-faith requirement is connected to the apparent exculpatory value of the evidence. This requirement makes intuitive sense because the State would have no incentive or improper motive to purposefully destroy inculpatory evidence.

▮ A second factor we consider when making a bad-faith determination is assessing whether the State deviated from its standard procedures when it destroyed the evidence. The Supreme Court held in *Trombetta* that if evidence was " 'destroyed by the [State] in good faith and in accord with their normal practices, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right.' " 467 U.S. at 487, 104 S.Ct. 2528 (quoting *Killian v. United States,* 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961)). Our court mirrored that holding in *Jenkins,* where the State cleaned bullet fragments and thus destroyed possible evidence. 782 N.W.2d at 236. In *Jenkins,* we concluded that it was "the BCA's practice to wash bullets it receives from the police for testing in a bleach solution." *Id.* The fact that the evidence was destroyed in accordance with standard procedures was part of our reasoning when we held

that the disputed evidence was not destroyed in bad faith and could be admitted. *Id.* at 236–37. Similarly, the court of appeals has concluded that if the State follows its standard practices, even "negligent inventory practices" do not evince bad faith on the part of the State. *State v. Harris,* 407 N.W.2d 456, 460 (Minn.App. 1987).

Here, it is undisputed that the BCA followed its normal practice to destroy blood samples 12 months after publishing test results obtained from the sample. Hawkinson argues that the BCA's policy to destroy evidence after 12 months itself constitutes bad faith, but we conclude that his argument lacks merit. Hawkinson's argument is in part undermined by the district court's finding that the BCA "couldn't have bad faith," because the reason the blood sample was destroyed is that the BCA did not know Hawkinson wanted the BCA to preserve the evidence. Moreover, the evidence at issue in this case was inculpatory, not exculpatory, so there was no motive for the State to destroy the inculpatory evidence. Hawkinson has presented no evidence of any kind that the blood sample might have been exculpatory. We conclude that the fact the State followed its normal procedure when it destroyed the evidence further undermines Hawkinson's claim that the State destroyed his blood sample in bad faith.

### 2. Impact of Hawkinson's Request to Preserve the Blood Sample

▮ An additional factor to consider is Hawkinson's request to preserve the blood sample. Hawkinson argues that the destruction of the blood sample in the face of his request to preserve that evidence is sufficient to show bad faith. Whether a discovery request, which includes a request to preserve, alters the due process analysis is a matter of first impression for

our court. While we have applied the Supreme Court's due process analysis, we have yet to consider the impact that a request to preserve evidence has on that analysis.

The fact that the State destroyed the blood sample in the face of Hawkinson's preservation request appears to have been the point of central concern for both the district court and the court of appeals. The district court concluded that "[t]he State was and is obligated by law as well as by [Hawkinson's] demand for disclosure and preservation of all evidence to preserve any and all evidence herein until this case was and is resolved." The court of appeals used Hawkinson's preservation request to distinguish this case from *Jenkins, Heath,* and *Trombetta,* stating that "there has been no assertion that [the State] 'followed a standard practice' by failing to comply with [Hawkinson's] demand for preservation of all evidence, including blood samples." *Hawkinson,* 812 N.W.2d at 204–05.

In essence, it appears the court of appeals adopted a standard that operates as a per se rule—once a request for preservation has been made, the evidence must be preserved and if it is not preserved, then it will be suppressed. But the Supreme Court explicitly rejected just such a per se rule in *Fisher,* and we reject such a rule here. *See Fisher,* 540 U.S. at 548, 124 S.Ct. 1200. Rather, we conclude that when the State destroys evidence after there has been a request to preserve that evidence, the request to preserve can be considered when assessing whether bad faith played a role in the State's destruction of the evidence. But a request to preserve evidence does not, by itself, negate the requirement that a defendant show bad faith.

With respect to this specific question, it is important to note that the Supreme Court has not altered its *Youngblood* and

*Trombetta* due process analysis in cases in which there is a pending discovery request. *See id.* In *Fisher,* the Court reversed the decision of an Illinois appellate court that held the destruction of evidence violated a defendant's due process rights, even though the evidence had been destroyed after the defendant requested preservation of "all physical evidence." *Id.* at 545, 548–49, 124 S.Ct. 1200. The defendant in *Fisher* had been arrested for possession of a bag of cocaine. He filed a motion for discovery "requesting all physical evidence the State intended to use at trial." *Id.* at 545, 124 S.Ct. 1200. He then fled Illinois and was a fugitive for over 10 years, but was eventually apprehended. Four forensic tests conducted upon the material seized from the defendant at the time of his initial arrest indicated that the material was cocaine; but, in accordance with its standard practices, Illinois had destroyed this material. After learning that the evidence had been destroyed, the defendant moved to suppress the forensic test results on the ground that the State had destroyed the physical evidence. The trial court ruled against the defendant and allowed the State to introduce evidence "tending to prove" that the defendant had possessed cocaine. *Id.* at 545–46, 124 S.Ct. 1200.

The Supreme Court upheld the trial court's decision in a per curiam opinion. The Court began the opinion by reiterating its standard due process analysis. *Id.* at 547–48, 124 S.Ct. 1200. The Court stated that "the failure to preserve this 'potentially useful evidence' does not violate due process '*unless a criminal defendant can show bad faith on the part of the police.*' " *Id.* (quoting *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333). The Court went on to hold that,

We have never held or suggested that the existence of a pending discovery re-

quest eliminates the necessity of showing bad faith on the part of police. Indeed, the result reached in this case demonstrates why such a *per se* rule would negate the very reason we adopted the bad-faith requirement in the first place: to "limi[t] the extent of the police's obligation to preserve evidence to reasonable grounds and confin[e] it to that class of cases where the interests of justice most clearly require it."

*Id.* (quoting *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333) (alteration in original).

In light of *Fisher,* several jurisdictions have held that requests for the preservation of evidence do not negate *Youngblood's* bad-faith requirement. *See Harness v. State,* 58 So.3d 1, 3–4 (Miss.2011) (upholding a DWI conviction where the defendant's blood sample was destroyed despite a request to preserve the sample); *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 258 (2008) (holding *Fisher* controlling on defendant's due process claim); *see also State v. Garcia,* 643 A.2d 180, 184–86 (R.I.1994) (holding, pre-*Fisher,* that the destruction of evidence did not violate a defendant's right to due process unless bad faith was shown, even when there was a request to preserve that evidence).

The facts in this case are similar to those in *Fisher.* While Hawkinson was not a fugitive for ten years, the length of time between the discovery request and the trial in *Fisher* was not a major factor in the Supreme Court's reasoning. Rather, *Fisher* was decided on the basis that bad faith is always required in order to suppress evidence that is merely potentially useful[2]—pending discovery requests notwithstanding. *Fisher,* 540 U.S. at 548, 124 S.Ct. 1200. A request to preserve evidence does not alter the requirements that, in order to be suppressed, evidence

must have apparent and material exculpatory value or the State must have destroyed the evidence in bad faith. *Id.* Therefore, when a defendant seeks to suppress test results from evidence that was: (1) merely potentially useful; (2) subject to a request to preserve; and (3) was destroyed by the State; the defendant must show that the State destroyed the evidence in bad faith before there is a violation of due process.

While we conclude that a request to preserve merely potentially useful evidence does not negate the bad-faith component of our due process analysis, we note that such a request may in some instances be relevant *within* the bad-faith component of our analysis. Therefore, in assessing whether bad faith was present in this case, we must consider the nature and sufficiency of Hawkinson's request to preserve the blood sample. We conclude that there are several reasons why Hawkinson's request is not a significant factor when assessing the presence of bad faith. These reasons include: (1) he requested that "blood tests" be preserved, which could mean either the physical sample or the testing results from that sample; (2) he did not specify the date of the sample or any specific information about it; (3) the request was contained in a long string of boilerplate requests, many of which were inapplicable to this case; (4) Hawkinson made his request in June 2010, and two months later, the BCA informed him that the sample would be destroyed the following April, yet he took no further action to preserve the sample before it was destroyed—and he did not even inquire about the sample until August 2011; (5) Hawkinson does not dispute that he had no intention to use or retest the sample; and

---

**2.** As discussed above, "merely potentially useful" evidence is the same as evidence lacking apparent and material exculpatory value, or non-*Brady* evidence.

(6) Hawkinson only found out about its destruction because he "just wanted to see if it was still there." When these reasons are analyzed and taken together, we conclude there is little indication that Hawkinson either made a concerted effort to have the blood sample preserved or intended to make use of the sample.

Accordingly, when the State destroys evidence protected under *Brady*—evidence that is apparently and materially exculpatory—the defendant need not show bad faith on the part of the State in order to establish a due process violation. But for non-*Brady*, "potentially useful" evidence, a defendant must make a showing that the State acted in bad faith when it destroyed the evidence. When the State destroys evidence that the State believes is inculpatory, or destroys evidence as part of its standard retention policies, those considerations weigh against a finding of bad faith. Finally, we conclude that a defendant's request to preserve merely potentially useful evidence does not change the fact that in order for there to have been a violation of due process, the defendant must show the State acted in bad faith when it destroyed such evidence.

For all the foregoing reasons, we conclude that Hawkinson's blood sample was not apparently and materially exculpatory in nature, and "no more can be said than that it could have been subjected to tests, the results of which might have exonerated" Hawkinson. *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333. We conclude the evidence was not protected under the *Brady* line of cases and that the State did not destroy this merely potentially useful evidence in bad faith. Accordingly, we hold that the BCA's destruction of the blood sample did not violate Hawkinson's right to due process and the district court erred when it suppressed the results of the blood test on due process grounds.

## II.

■ Hawkinson . cites *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), to assert that his constitutional right to confront witnesses via cross-examination extends to physical evidence and that the destruction of evidence can constitute a violation of a defendant's Confrontation Clause rights. The State counters that the physical evidence itself is not testimonial and that the Confrontation Clause does not extend to physical evidence, but only to individuals who testify about physical evidence.

■ We have previously applied the Supreme Court's holding in *Crawford* that defendants have a right under the Sixth Amendment to cross-examine witnesses who make certain statements that are testimonial in nature. *E.g., State v. Hull,* 788 N.W.2d 91, 100–02 (Minn.2010). At the core of this right is the ability to cross-examine witnesses because "the principal evil at which the Confrontation Clause was directed was ... particularly ·[the civil law's] use of *ex parte* examinations as evidence against the accused." *Crawford,* 541 U.S. at 50, 124 S.Ct. 1354.

The Supreme Court recently extended the Confrontation Clause right to include witnesses who testify about forensic tests. In *Bullcoming,* the Court held that admission of a forensic report as evidence violated a defendant's Confrontation Clause rights when the specific technician who had conducted the forensic analysis was not made available at trial, and the defendant had not had a chance to cross-examine the analyst before trial. *Bullcoming,* 131 S.Ct. at 2713–16. The United States District Court for the District of Minnesota recently applied this right. *See Jackson v. Fisher,* Civil No. 11–2670, 2011 WL

5593659, at *4 (D.Minn. Oct. 6, 2011) *adopted, Jackson–Bey v. Fisher,* Civil No. 11–2670, 2011 WL 5598352 (D.Minn. Nov. 17, 2011). That court stated, "[i]n *Bullcoming,* the Supreme Court held that a state criminal defendant has a Sixth Amendment right to cross-examine a scientist who produces a forensic laboratory report that is used as evidence against the defendant." *Id.*

In *State v. Weaver,* our court of appeals similarly held that "because [the defendant] had no opportunity to cross-examine the laboratory technician" who performed the relevant forensic analysis, and that technician's "identity was unknown," testimony about the forensic test should not have been admitted. 733 N.W.2d 793, 796 (Minn.App.2007).

*Crawford, Bullcoming, Jackson,* and *Weaver* are all distinguishable from the present case. Here, the laboratory technician who performed the test on Hawkinson's blood sample is known and is available to testify at trial, and the State has said that the technician will in fact testify. This case does not involve the issue of whether a defendant must be afforded an opportunity to cross-examine the forensic analyst who actually conducted the tests. *Cf. Bullcoming,* 131 S.Ct. at 2713–16. Rather, the issue before us is whether a defendant like Hawkinson must be afforded the opportunity to cross-examine a piece of physical evidence—specifically a blood sample. We conclude that the historic notion of cross-examination does not encompass such an examination, nor has such a right been recognized by the Supreme Court or our court. More specifically, the rights that the Confrontation Clause confer relate to the examination of witnesses—in this case the forensic analyst who was involved in the testing of the sample—not the examination of physical evidence. Therefore, we hold that the dis-

trict court erred by ruling that Hawkinson had a Confrontation Clause right to conduct forensic testing on his blood sample.

## III.

■ Hawkinson's final claim is that the destruction of the blood sample violated the Minnesota Rules of Criminal Procedure. He cites Minn. R.Crim. P. 9.01, subd. 1(4)(b), which he argues "requires a prosecutor to allow the Defendant to conduct other reasonable tests with respect to the results of scientific tests made by the State that relate to the case." The State notes that the district court did not specify which rules in the "Minnesota criminal discovery process" were violated, but the State discusses several rules that may be applicable and asserts that all criminal rules were followed in this case.

The Minnesota Rules of Criminal Procedure require the State to notify defendants of evidence obtained against them. Minn. R.Crim. P. 7.01(a). In gross misdemeanor and felony cases, the State is also required to allow defendants to conduct their own "reasonable" testing of physical evidence. Minn. R.Crim. P. 9.01, subd. 1(4)(b). But, in misdemeanor cases, all that is required under the rules is that a defendant be allowed to "inspect the police investigatory reports," and "[u]pon request, the prosecutor must also disclose any material or information within the prosecutor's possession and control that tends to negate or reduce the guilt of the accused." Minn. R.Crim. P. 9.04.

In this case, Hawkinson is charged with misdemeanor fourth-degree DWI, a violation of Minn.Stat. § 169A.20, subd. 1(5). The State disclosed the test results and all evidence to Hawkinson. The State has fulfilled the applicable discovery provisions of the Minnesota Rules of Criminal Procedure for misdemeanor cases and Hawkinson has failed to present any evidence to

refute this conclusion. Therefore, we hold that the State did not violate any of the Minnesota Rules of Criminal Procedure when it destroyed Hawkinson's blood sample and the district court erred in suppressing the results of the blood test.

Reversed and remanded.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.