*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1321**

State of Minnesota,
Respondent,

vs.

Charles Edward Love,
Appellant.

**Filed August 4, 2014
Affirmed in part, reversed in part, and remanded
Willis, Judge***

Anoka County District Court
File No. 02-CR-13-243

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Marcy S. Crain, Assistant County Attorney, Raina Urton, certified student attorney, Anoka, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Ted Sampsell-Jones, Special Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Hooten, Judge; and Willis, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**WILLIS**, Judge

On appeal from his conviction of third-degree burglary and misdemeanor theft, appellant argues that (1) the district court committed reversible error by improperly instructing the jury about the elements of burglary; (2) there is insufficient evidence to support his burglary conviction; (3) the district court abused its discretion by admitting a witness's recollections of a destroyed video; and (4) the district court abused its discretion by admitting a video without proper authentication. We affirm in part, reverse in part, and remand.

### FACTS

On Sunday, December 30, 2012, at about 11:45 a.m., H.L. found that cash and a laptop computer had been taken from his employer, Fu Yuan, a restaurant in Coon Rapids. After making this discovery, H.L. reviewed surveillance footage from the neighboring gas station's exterior cameras with the gas station's manager, T.C. The footage showed a man enter the restaurant and leave several minutes later. H.L. then returned to the restaurant to review surveillance video from inside the restaurant, which showed the same man inside the restaurant, where he was seen walking to the cash-register counter and opening the cash-register drawer; searching the pockets of jackets hanging in the restaurant; and walking to a table where a laptop was sitting. The man seen in the videos was wearing a hat, a jacket with a fur-lined hood, a striped shirt, black pants, and a tiny earring. When H.L. examined the cash register, he found that

approximately $80 in one-dollar bills was missing, along with a Toshiba laptop computer that had been on a table in the restaurant.

Later the same day, a man driving a green Chevrolet Tahoe purchased gas from the neighboring gas station using 26 one-dollar bills, and T.C. recognized the man as being the same person he had seen in the surveillance videos. T.C. provided the vehicle's description and license-plate number to police, who identified the vehicle's owner as appellant Charles Love, a picture of whom matched the man seen on the surveillance videos. Police obtained a search warrant for the green Tahoe and an apartment in a building next to the strip mall where the restaurant was located. The apartment was rented to a person named Charles Love. When executing the warrants, police found Love in a vehicle in the parking lot of the apartment building. He was wearing a jacket similar to the one seen in the surveillance videos but without a hood. In the apartment, which was rented by Love's son, among other possessions linked to Love, police found a green knit hat; a zipped-off, fur-lined hood that matched the jacket; a pair of dark jeans; a striped polo shirt; and a pair of tennis shoes, all matching the clothing seen on the suspect in the surveillance videos.

Love was charged with third-degree burglary, and misdemeanor and felony theft. The felony-theft charge was dropped before trial. Love moved to dismiss the remaining charges or suppress testimony regarding the internal video from the restaurant because of the state's failure to preserve that surveillance footage. The state argued that the video was not preserved because of a malfunction in the recording system and argued that there was no bad faith and that there was no exculpatory evidence in the video. The district

3

court denied Love's motions, and a jury trial was held. H.L. testified regarding the contents of the internal-surveillance video and about the restaurant's hours of operation. A photograph admitted into evidence shows that the restaurant's posted opening time on Sundays was 11:30 a.m. Three police officers also testified, including one who said that, based on his analysis of the gas-station's surveillance video, Love entered the restaurant at about 9:30 a.m. T.C. testified regarding the surveillance equipment used at the gas station. Love's son also testified that Love had gone out for groceries between 9:00 a.m. and 10:00 a.m. and returned with a black Toshiba laptop, but no groceries, and he identified Love as the man in the surveillance footage. Love waived his right to testify and presented no evidence.

Before closing arguments, the state requested an amendment to the jury instructions to include language indicating that even if an establishment is open to the public, a burglary can occur if an individual enters an area that is not open to the public. Over Love's objection, the district court amended the jury instructions to include this language. The jury found Love guilty of both counts, and Love was sentenced to 39 months in prison. This appeal follows.

## DECISION

### I. The burglary jury instruction misstated Minnesota law.

District courts are allowed "considerable latitude" in the selection of language for jury instructions, *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002), but the instructions must "fairly and adequately explain the law of the case," *State v. Koppi*, 798 N.W.2d

4

358, 362 (Minn. 2011). "An instruction is in error if it materially misstates the law." *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001).

Love contends that the district court misstated the second element of burglary when it instructed the jury as follows:

> Second, the defendant entered a building without the consent of the person in lawful possession. The entry does not have to be made by force or by breaking in. Entry through an open or unlocked door or window is sufficient. Whoever enters a building while open to the general public does so with consent, except when consent was expressly withdrawn before the entry. A person who enters a building open to the public exceeds the scope of consent given to members of the public by entering an area of the building that is off limits to the general public.

Love objects to the last sentence of this instruction, arguing that it is a misstatement of Minnesota law.

Minn. Stat. § 609.582, subd. 3 (2012), provides that "[w]hoever enters a building without consent and with intent to steal . . . while in the building . . . commits burglary in the third degree." To enter a building without consent means "to enter a building without the consent of the person in lawful possession," but "[w]hoever enters a building while open to the general public does so with consent except when consent was expressly withdrawn before entry." Minn. Stat. § 609.581, subd. 4 (2012). The standard jury instruction detailing the elements of third-degree burglary mirrors this language and does not include the last sentence of the instruction given here. 10A *Minnesota Practice*, CRIMJIG 17.11 (2006). The state argues that the disputed language is consistent with the holding of *State v. McDonald*, 346 N.W.2d 351 (Minn. 1984), contending that even if

5

the restaurant was open to the public when Love entered, he exceeded the scope of consent given to the public by going behind the cash-register counter. We disagree.

*McDonald* was a summary affirmance on a sufficiency-of-the-evidence issue in an appeal from a burglary conviction. The appellant there "entered a drugstore during business hours but at a time when the pharmacy was closed and, without consent, entered a closed storage room that was off limits to the general public and from there tried to gain access to the locked pharmacy for the purpose of stealing controlled substances." *Id.* at 352. In affirming his conviction, the supreme court stated that there was no burglary when the appellant entered the "part of the store that was open to the public," but "the burglary was complete once defendant exceeded the scope of the consent given him and other members of the public and entered the storage room with intent to gain access to the locked pharmacy from there." *Id.* *McDonald* is factually distinguishable from this case and does not establish the definition of burglary provided by the district court here. District courts should exercise extreme caution when using language from a sufficiency-of-the-evidence case in jury instructions. *See State v. Gassler*, 505 N.W.2d 62, 68 (Minn. 1993) (stating that jury instructions are conceptually different from tests for the sufficiency of evidence).

Though the evidence suggests that Love went to the cash-register counter, there is no evidence that he went into any separate, contained area not open to the public or that consent to enter the cash-register area was expressly revoked. While this is a novel case, a jury instruction given in the form here could lead to the result of having the crime committed, and the punishment imposed, depend entirely on where a person is standing

6

while in a building that is open to the public. The ruling in *McDonald* is not applicable to jury instructions, and the jury instruction provided here does not reflect the language of the statute.

Having concluded that the jury instruction was erroneous, we must consider whether the error was harmless. *State v. Vance*, 765 N.W.2d 390, 394 (Minn. 2009), *overruled on other grounds by State v. Fleck*, 810 N.W.2d 303 (Minn. 2012); *see State v. Mahkuk*, 736 N.W.2d 675, 683 (Minn. 2007) (quotation omitted) ("An erroneous jury instruction does not require a new trial if the error was harmless beyond a reasonable doubt."). Because consent to enter a building is a key element in burglary cases and was a central issue in this case, we cannot say that the erroneous jury instruction had no significant impact on the verdict rendered because it gave an expanded basis upon which the jury could conclude that Love did not have the owners' consent to be in the restaurant. *See Mahkuk*, 736 N.W.2d at 683 ("A jury instruction given in error is harmless only if it can be said that, beyond a reasonable doubt, the error had no significant impact on the verdict rendered." (quotation omitted)); *see State v. Watkins*, 820 N.W.2d 264, 268 (Minn. App. 2012) ("failure to properly instruct the jury on all elements of the offense charged is plain error" (quotation and alteration omitted)), *aff'd on other grounds*, 840 N.W.2d 21 (Minn. 2013). Accordingly, we reverse Love's convictions and remand to the district court for further proceedings consistent with this opinion.

**II.    The evidence may be sufficient to support a conviction of burglary.**

Love concedes that there is sufficient evidence to support his theft conviction but argues that there is insufficient evidence to establish that he entered the restaurant without consent, therefore his actions could not constitute burglary.  In evaluating the sufficiency of the evidence, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction," is sufficient to allow the jury to reach a verdict of guilty.  *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted).  "And we will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Id.* (citation omitted).

As noted above, to establish that Love committed a burglary, the state had to prove that he entered the restaurant without consent by showing that it was not open to the public at the time of the burglary or that consent to enter had been expressly revoked.  Minn. Stat. § 609.581, subd. 4.  The state argues that the restaurant was not open to the public at the time Love entered.  The record contains conflicting evidence.  While Love entered the restaurant about two hours before its posted opening time, he entered through an unlocked door, and H.L. testified that it is the restaurant's practice not to refuse orders that are placed shortly before it officially opens for the day.  "[I]t is the jury's duty to weigh conflicting evidence and to make credibility determinations." *State v. Gunderson*, 812 N.W.2d 156, 165 (Minn. 2012).  Additionally, the state asserted in its closing argument that, even if the restaurant was open, Love committed a burglary by exceeding

8

the scope of consent given by going to the area around the cash register, which we have determined is a misstatement of the law. Although the record may contain sufficient evidence to support Love's burglary conviction, because the jury did not have the opportunity to weigh conflicting evidence based on a proper instruction, we reverse and remand for a new trial. *See id.* (arriving at the same conclusion regarding the charge in that case).

III. **Because Love did not demonstrate that the restaurant's surveillance footage was destroyed in bad faith, the district court did not abuse its discretion by allowing a witness to testify regarding his recollections of this footage.**

Love argues that the district court erred by admitting H.L.'s testimony regarding his recollections of the contents of the internal-surveillance footage, contending that this violated the best-evidence rule because the state destroyed this evidence in bad faith. We disagree.

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). Under the best-evidence rule, an original video recording is required to prove its contents, Minn. R. Evid. 1002, but other evidence of its contents is admissible if the originals have been lost or destroyed, "unless the proponent lost or destroyed [it] in bad faith." Minn. R. Evid. 1004(1); s*ee* Minn. R. Evid. 1001(2) (a video or motion picture is considered a "photograph" under the rules of evidence). The state's failure to preserve potentially useful evidence "does not constitute a denial of due process unless the defendant shows bad faith on the part of the police." *State v. Jenkins*, 782 N.W.2d 211, 235 (Minn. 2010) (citation omitted). Bad faith requires an intentional

9

act by the state, as well as a showing that the state either (1) "purposefully destroyed evidence favorable to a defendant so as to hide it," or (2) "failed to follow standard procedures when it destroyed the evidence." *State v. Hawkinson*, 829 N.W.2d 367, 373 (Minn. 2013). The defendant has the burden of demonstrating bad faith. *Id.*

Relying on *Hawkinson*, Love argues that the district court's determination that the destruction of the internal-surveillance footage was not in bad faith is erroneous because the court failed to consider whether the state followed standard procedure in collecting evidence. But *Hawkinson* involved the destruction of evidence, not its collection. *Id.* at 373. Even if Love is correct, he failed to meet his burden of demonstrating bad faith by establishing a deviation from the state's standard procedure in collecting evidence. Instead he merely describes efforts that the police could have taken to preserve the surveillance footage.

Love alternatively argues that even if the state did not act in bad faith, the district court erred by admitting secondary evidence when the state did not prove that the internal surveillance footage was lost or destroyed. *See City of St. Paul v. Dahlby*, 266 Minn. 304, 315, 123 N.W.2d 586, 592 (1963) (the "party seeking to introduce secondary evidence as to the provisions of a lost instrument must prove that a diligent but unsuccessful search has been made for it."). But the record reflects that the state was unable to copy the footage from the surveillance system when it attempted to collect this evidence in the days immediately after the incident and that the surveillance system retains footage for only eight days. By the time of trial, three months had passed, and the district court concluded that the footage "got erased in the normal course of this business

10

doing its business." This determination is supported by the record, which suggests that a diligent search by the state would have been unsuccessful.

**IV.    The external-surveillance footage was adequately authenticated.**

Love also contends that the district court abused its discretion by admitting the external-surveillance footage recorded by the gas station's surveillance system because the evidence was not properly authenticated. We disagree.

"[T]he standard of review for the adequacy of foundation with respect to the admission of evidence is abuse of discretion." *Turnage v. State*, 708 N.W.2d 535, 542 (Minn. 2006). "The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Minn. R. Evid. 901(a). This court has adopted a method for authenticating video evidence "by testimony describing the reliability of the process or system that created the tape . . . if the evidence sufficiently demonstrates that the videotape is what its proponent claims." *Matter of Welfare of S.A.M.*, 570 N.W.2d 162, 166 (Minn. App. 1997).

Love argues that T.C.'s testimony was insufficient to authenticate the video because T.C. was not a video technician, and in *S.A.M.* this court determined that a video technician's testimony as to how the video was made, that it produces an accurate result, and as to its chain of custody was sufficient to demonstrate the reliability of the process. *Id.* at 166-67. But T.C. provided an explanation of how many cameras constitute the gas station's surveillance system, a description of the monitor, and a description of how the system's database holds video on its hard drive. Additionally, he explained that the

11

system is always turned on and automatically records. T.C. also testified that he had used the system to look at recorded footage on various occasions, and he explained that the live feed from the cameras, though a millisecond off, displayed an image on the system's monitor that showed what the cameras were actually seeing and recording. T.C. also testified that, aside from being condensed and having titles added, the external footage presented as evidence was accurate, based on his viewing of the footage on the surveillance system's monitor with H.L. Based on *S.A.M.* and the "broad guideline for authentication set out in Rule 901(a): that is, evidence was produced showing that the tape is what its proponent claimed," *id.* at 166-67, we conclude that the district court did not abuse its discretion by determining that the external-surveillance footage was properly authenticated.

Love also contends that the timestamp on the video was not properly authenticated. But even if T.C.'s testimony were insufficient for this purpose, the police officer who condensed the video testified that the timestamp is embedded in the video file and that his investigation showed that the timestamp was an hour off because it had not been adjusted for daylight-savings time, but it was otherwise accurate. This evidence shows that the timestamp on the tape is what the state claimed. The district court did not abuse its discretion by admitting evidence of the timestamp.

**Affirmed in part, reversed in part, and remanded.**