*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0346**

Troy K. Scheffler, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed December 28, 2015
Affirmed
Reyes, Judge**

Anoka County District Court
File Nos. 02CV113598; 02CV11991

Troy Scheffler, Coon Rapids, Minnesota (pro se appellant)

Lori Swanson, Attorney General, Rory C. Mattson, Assistant Attorney General, St. Paul, Minnesota (for respondent)

        Considered and decided by Peterson, Presiding Judge; Halbrooks, Judge; and Reyes, Judge.

## U N P U B L I S H E D   O P I N I O N

**REYES**, Judge

        Appellant makes several arguments in support of his appeal from a district court order upholding his license revocation under the implied-consent law and his license cancellation as inimical to public safety.  We affirm.

**FACTS**

At approximately 2:02 a.m. on December 13, 2010, Officer Daniel James Rice was dispatched to a Taco Bell restaurant on University Avenue in the City of Blaine. The Taco Bell employees had called to request police assistance because a male would not leave the premises. It is Taco Bell's policy to serve its patrons exclusively by drive-through service after a certain time at night.

When the officer arrived at the Taco Bell, he located appellant Troy Scheffler standing inside the restaurant. The officer introduced himself to appellant and explained why he was called to the Taco Bell. Appellant did not produce a driver's license but instead identified himself using his full name and date of birth. The officer radioed another officer to confirm appellant's identity. The officer then inquired where appellant was headed. Appellant responded that he was going to walk home. Although the encounter was brief, the officer believed that he could smell alcohol on appellant's breath. Appellant denied having consumed alcohol. Because appellant was willing to leave voluntarily on foot, the officer determined that he had no basis to detain appellant and allowed him to depart unattended.

After speaking with the Taco Bell employees, however, the officer noticed a disparity between the number of employees and vehicles in the Taco Bell parking lot. The officer decided to run the plates on the parked vehicles and discovered that one of the vehicles was registered to appellant. The officer also learned that appellant had a no-use

restriction on his driver's license.[1]  The officer also noticed that there was a dog inside appellant's vehicle.  Since it was winter, the officer believed that appellant would come back for his vehicle and the dog, so he decided to await appellant's return.

About 15 to 20 minutes later, the officer observed a white van pull up and saw a male exit the van and move quickly to appellant's vehicle.  The officer suspected that it was appellant running to his vehicle, so the officer followed the vehicle as it was driven out of the Taco Bell parking lot.  When the driver of the vehicle failed to signal a right turn in advance of the intersection of University Avenue and Egret Boulevard, as required by Minn. Stat. § 169.19, subd. 5 (2010), the officer initiated a traffic stop.

Upon approaching the vehicle, the officer confirmed that the male driver was appellant, asked appellant where he was coming from, and asked appellant whether he had consumed any alcohol.  The officer observed that appellant's speech was slurred, his eyes were bloodshot and watery, and his breath smelled of alcohol.  The officer asked appellant if he would submit to a preliminary breath test.  Appellant refused.

The officer then asked appellant to perform a series of field sobriety tests.  First, the officer asked appellant to perform the horizontal-gaze nystagmus test.  Appellant informed the officer that he had a screw in his left eye, which would interfere with the test. The officer observed indicia of intoxication in appellant's left and right eyes.  Next,

---

[1] A no-use restriction prohibits a person from consuming any alcohol, whether or not that individual is operating a vehicle.  Minn. R. 7503.1700, subp. 4 (2009).  Driving with a no-use restriction after having consumed alcohol is a gross misdemeanor.  Minn. Stat. § 171.09, subd. 1(f)(1) (2010).

the officer had appellant perform the walk-and-turn test and the one-legged-stand test.[2] The officer observed indicia of intoxication on both tests. Finally, the officer asked appellant to perform two non-standard tests, the alphabet test and the dexterity test. Appellant had difficulty completing both non-standard tests in accordance with the officer's instructions.

The officer again asked appellant to submit to a preliminary breath test, and appellant again refused. Based on his observations, the officer concluded that appellant was under the influence of alcohol and placed appellant under arrest. The officer read appellant the implied-consent advisory and allowed appellant to speak to an attorney. After speaking with his attorney, appellant asked to see a doctor because he thought he had frostbite. Appellant was taken to a doctor and received treatment for his frostbite. The officer then asked appellant to submit to a blood test. Appellant requested a breath test. The officer informed appellant that he could choose between a blood or urine test. Appellant asked to speak with his attorney a second time, and the officer permitted him to do so. Following that phone call, appellant agreed to take a urine test. Appellant's alcohol concentration at the time of the test was 0.18.

A hearing was held on appellant's (1) petition for license reinstatement under Minn. Stat. § 169A.53 (2010), and (2) petition for license reinstatement under Minn. Stat. § 171.19 (2010). The district court issued an order upholding the revocation

---

[2] According to the officer, appellant did not voice any objections or note any physical impairments when asked to perform the walk-and-turn and one-legged-stand tests. Appellant takes issue with this fact and asserts that he most certainly would have noted his frostbitten toes and oversized boots, which impaired his performance.

of appellant's driver's license under the implied-consent law and the cancellation of appellant's driver's license as inimical to public safety. This appeal followed.

## D E C I S I O N

### I. The district court did not err in sustaining appellant's license revocation under Minnesota's Implied Consent Law, Minn. Stat. § 169A.53.

#### A. The district court's finding that the officer testified credibly at the omnibus hearing was not clearly erroneous.

Appellant argues that the officer's testimony regarding what occurred on the night of December 13, 2010, was not credible. But the district court explicitly stated that it found the officer's testimony credible. Absent clearly contradictory evidence, this court will not disturb the district court's credibility determinations. *State v. Smith*, 448 N.W.2d 550, 555 (Minn. App. 1989), *review denied* (Minn. Dec. 29, 1989) ("Determinations of credibility of witnesses at the omnibus hearing are left to the trial court, and those determinations will not be overturned unless clearly erroneous."). We discern no clear error in the district court's credibility determination.

#### B. The district court did not err in determining that the officer had reasonable suspicion to justify the stop of appellant's vehicle.

##### 1. Traffic violations

Appellant asserts that his failure to signal did not provide the officer with reasonable suspicion to justify the stop of his vehicle. In order to conduct a brief investigatory stop of a vehicle, the police must have reasonable suspicion of criminal activity. *State v. Richardson,* 622 N.W.2d 823, 825 (Minn. 2001). This court reviews de novo a district court's determination of whether there was reasonable suspicion to justify

5

a stop. *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000). Observation of a traffic violation, however insignificant, provides an objective basis for an officer to stop a vehicle. *State v. George*, 557 N.W.2d 575, 578 (Minn. 1997).

First, appellant asserts that the "alleged failure to signal was not [at] University or Egret" but instead occurred on a private thoroughfare. As a preliminary matter, this argument was not presented to the district court and, therefore, is not properly before this court on appeal. *State v. Beaulieu*, 859 N.W.2d 275, 278 (Minn. 2015). Nevertheless, appellant's claim is without merit. Appellant's failure to signal occurred just prior to a traffic semaphore located at the intersection of University and Egret. *See* Minn. Stat. § 169.011, subd. 49 (2010) (defining "[o]fficial traffic-control devices" as "all signs, signals, markings, and devices . . . placed or erected by authority of a public body or official having jurisdiction"). This supports the finding that appellant's traffic violation occurred on a public road. *Id.*; *see also State v. Williams*, 415 N.W.2d 351, 354-55 (Minn. App. 1987) (asserting that the turning of traffic onto public streets is normally a topic of public, not private, interest and discussing signs placed on traffic semaphores as "posted on public property"). Absent clear evidence to the contrary, we defer to the district court's factual determinations. *Lee*, 585 N.W.2d at 382-83. Merely labeling a road "private drive" in a map exhibit submitted by appellant to this court is insufficient contradictory evidence. When the record supports the district court's findings, we cannot rely on appellant's bald assertions on appeal to overrule those findings. *Smith*, 448 N.W.2d at 555.

6

Alternatively, appellant contends that it is not possible to signal a turn as required by Minn. Stat. § 169.19, subd. 5, in advance of the intersection of University and Egret. However, again, appellant's contention is not supported by the record. The district court concluded that there is enough room to signal the intention to turn as required by law prior to the intersection. Appellant submitted a pictorial exhibit in an effort to illustrate the impossibility of compliance with Minn. Stat. § 169.19, subd. 5 at University and Egret. Yet, as noted by the district court and this court in appellant's related criminal matter, rather than prove the impossibility of compliance with Minn. Stat. § 169.19, subd. 5, appellant's exhibit demonstrates that compliance is indeed possible. Therefore, the officer lawfully stopped appellant's vehicle for failing to appropriately signal his turn. Minn. Stat. § 169.19, subd. 5.; *see also George*, 557 N.W.2d at 578.

### 2. Unascertained driver of vehicle

Appellant argues that the stop of his vehicle was improper because the officer was not certain it was appellant driving appellant's vehicle. Appellant's argument is meritless. The district court determined that the officer's assumption that appellant was driving his vehicle was reasonable. Unless an officer is given reason to suspect otherwise, the officer may assume that the registered owner of a vehicle is driving that vehicle. *State v. Pike*, 551 N.W.2d 919, 922 (Minn. 1996). During the officer's initial encounter with appellant, he detected the odor of alcohol on appellant's breath. He subsequently learned that appellant had a no-use restriction on his license. The officer then observed someone resembling appellant drive off in appellant's vehicle. Nothing the officer observed called into question whether someone other than appellant was

7

driving appellant's vehicle. It is a gross misdemeanor to operate a motor vehicle in violation of a no-use restriction. Minn. Stat. § 171.09, subd. 1(f)(1). Thus, upon seeing someone whom the officer suspected was appellant driving appellant's vehicle, and knowing that appellant had a no-use restriction, the officer had reasonable suspicion to stop appellant's vehicle. Finally, it is worth noting that this provided the officer with an independent basis for stopping appellant's vehicle, exclusive of the traffic violation.

### 3. Warrant requirement for stop

Appellant contends that the officer was required to obtain a warrant to detain appellant. Alternatively, appellant asserts that the officer was required to obtain a warrant to detain appellant for the length of time that he did. Appellant did not present this argument to the district court, and therefore, we need not address it. *Beaulieu*, 859 N.W.2d at 278. Nevertheless, it is well-established that, if an officer observes a violation of a traffic law, the officer has an objective basis for stopping the vehicle, and the officer does not need a warrant to conduct such a stop. *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004); *George*, 557 N.W.2d at 578. Moreover, although an officer may not detain an individual indefinitely, so long as the traffic stop was justified at its inception, an officer may detain an individual for as long as necessary to effectuate the initial purpose of the stop. *Askerooth*, 681 N.W.2d at 364; *State v. Fort*, 660 N.W.2d 415, 418-19 (Minn. 2003). The record reflects that the officer detained appellant solely to determine whether he was operating a vehicle while intoxicated. Accordingly, the stop's duration was reasonable, and the officer was not required to obtain a warrant.

**C.**   **The district court did not err in concluding that the officer had probable cause to arrest appellant.**

Appellant argues that the officer lacked probable cause to arrest him because the field sobriety tests are of questionable validity. The district court concluded that the officer had probable cause to arrest appellant. We agree.

"[T]raditionally the foundation required before an opinion regarding intoxication can be given has been testimony concerning observation of manner of walking and standing, manner of speech, appearances of eyes and face, and odor, if any, upon such person's breath." *State v. Ards*, 816 N.W.2d 679, 684 (Minn. App. 2012) (quoting *State v. Hicks*, 301 Minn. 350, 353, 222 N.W.2d 345, 348 (1974)). Here, the officer testified that appellant had trouble performing both the walk-and-turn test and the one-legged stand test. Additionally, the officer testified that appellant had slurred speech, had bloodshot and watery eyes, and smelled of alcohol. Appellant also failed the horizontal-gaze nystagmus test with both eyes as well as the two additional non-standard tests. Thus, the district court did not err by allowing the officer to testify regarding appellant's performance on the field sobriety tests. Moreover, even if we were to exclude the officer's observations regarding appellant's performance on the field sobriety tests from the probable cause inquiry, the officer still had sufficient justification to arrest appellant based on the above-noted observations of slurred speech, bloodshot and watery eyes, and the odor of alcohol. *State v. Kier*, 678 N.W.2d 672, 678 (Minn. App. 2004).

Appellant further provides a litany of reasons why he was physically unable to perform the field sobriety tests and asserts that those physical impairments hindered his

9

performance on the tests.  But the district court discounted appellant's self-serving assertions regarding his physical abilities.  In particular, the district court noted appellant's failure to provide the court with documentation from a medical professional establishing that the screw in his eye would negatively impact his performance on the horizontal-gaze nystagmus test.  The district court, as the finder of fact, was in the best position to judge the credibility of the evidence before it.  *Smith*, 448 N.W.2d at 555.  This court does not overturn the district court's factual findings on appeal unless they are clearly erroneous.  *Id.*  We discern no clear error here.

> **D.**     **The district court did not err in concluding that the procedures followed to obtain and preserve appellant's urine sample were lawful.**

Appellant raises three arguments regarding the collection and preservation of his urine sample: (1) he should have been permitted to select the method of chemical testing used to determine his alcohol concentration; (2) his urine sample was unreliable because it was a first-void sample; and (3) his constitutional right to due process was violated by the destruction of his urine sample.  Initially, it should be noted that appellant is asserting the first and third arguments for the first time on appeal, and appellant withdrew the second argument before the district court.  Therefore, these arguments need not be addressed on appeal.  *Beaulieu*, 859 N.W.2d at 278.  Appellant's arguments nevertheless fail on the merits.

Regarding appellant's first argument, Minn. Stat. § 169A.51, subd. 3 (2010) provides, "[A]ction may be taken against a person who refuses to take a urine test only if an alternative test was offered."  *Id.*; *see also State v. Hagen*, 529 N.W.2d 712, 714

(Minn. App. 1995) (holding that the officer complied with the statute by offering Hagen the choice of taking either a blood or urine test).  Here, appellant was offered the choice between a blood or urine test.  Thus, the officer satisfied the requirements of the statute.  Appellant is not entitled to select his preferred method of testing, and any embarrassment appellant suffered from selecting the urine test could have been avoided if appellant had opted for the blood test.

Appellant's second argument is foreclosed by precedent, as we have previously "held that a urine test administered without a prior void is a valid and reliable testing method." *Hayes v. Comm'r of Pub. Safety*, 773 N.W.2d 134, 138 (Minn. App. 2009).

Finally, as to appellant's third argument, *State v. Hawkinson*, 829 N.W.2d 367 (Minn. 2013), is controlling.  Under *Hawkinson*, appellant's urine sample "was not apparently and materially exculpatory in nature." *Id.* at 377.  Therefore, a finding of bad faith on the part of the state is required for a due-process violation to have occurred. *Id.* But the destruction of appellant's urine sample was the result of standard procedures at the BCA, and appellant was notified of those procedures.  In this case, as in *Hawkinson*, there was no bad faith on the part of the state.  Accordingly, appellant's due-process rights were not violated by the destruction of his urine sample.

**E.** **The district court did not err in determining that the officer lawfully obtained appellant's urine sample.**

Appellant cites *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), *cert. granted*, 83 U.S.L.W. 3916 (U.S. Dec. 11, 2015) (No. 14-1470), for the proposition that the implied-consent law violates his substantive due-process rights.  The district court concluded that

11

*Bernard* is "not necessary to evaluate [appellant's] claims." The district court is correct. *Bernard* addressed breath, not urine, testing. Additionally, at no point did Bernard consent to chemical testing. Therefore, *Bernard* is inapposite. *Id.* at 767.

Appellant also cites *Missouri v. McNeely*, 133 S. Ct. 1552 (2013) in support of his claim that a warrant was required to obtain a urine sample from him. The district court determined that appellant's "reliance on *McNeely* is misplaced." We agree. Appellant voluntarily provided a urine sample. Consent is a long-established exception to the warrant requirement. *State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973)). Because appellant consented to the urine test, his assertion that the officer needed a warrant is without merit.

Appellant further argues that his consent to the chemical test was coerced. Appellant asserts that his case is distinguishable from *Brooks*. *Id.* Alternatively, appellant urges this court not to follow *Brooks*. The district court concluded that *Brooks* is controlling. We agree with the district court that *Brooks* is binding precedent and dispositive. *Id.* at 570. In *Brooks*, the supreme court held that the warrantless testing of blood or urine does not offend the Fourth Amendment if, under the totality of the circumstances, the driver freely and voluntarily consented to testing. *Id.* at 572. In appellant's case, the totality of the circumstances establish that appellant's consent was voluntary. Appellant was read the implied-consent advisory, which "made clear to him that he had a choice of whether to submit to testing." *Id.* at 572. Appellant had the opportunity to consult with an attorney, twice. Finally, appellant, like Brooks, "was

12

neither confronted with repeated police questioning nor was he asked to consent after having spent days in custody." *Id.* at 571. In short, "nothing in the record suggests that [appellant] was coerced in the sense that his will had been overborne and his capacity for self-determination critically impaired." *Id.* (quotation omitted). Rather, the record indicates that the officer accommodated appellant's every request. Therefore, under *Brooks*, appellant's claim fails.

## II. The district court did not err in sustaining appellant's license cancellation under Minn. Stat. § 171.19 as inimical to public safety.

### A. Sufficient evidence supports the cancellation of appellant's license.

Appellant argues that there was no basis to cancel his license under Minn. Stat. § 171.19 because the evidence supporting the cancellation was obtained and retained illegally. For the reasons previously noted, appellant's arguments regarding the legality of the stop and subsequent acts of the state are without merit. Therefore, the district court properly concluded that there was sufficient evidence to sustain the Commissioner of Public Safety's cancellation of appellant's license. Minn. Stat. § 171.19; *see also* Minn. Stat. § 171.09 (2010); Minn. R. 7503.1700, subp. 6 (2009). Indeed, this court has previously affirmed cancellations based on less perilous conduct. *Constans v. Comm'r of Pub. Safety*, 835 N.W.2d 518, 524 (Minn. App. 2013) (affirming the district court's decision to uphold the cancellation of appellant's license when appellant's conduct did not include impaired driving).

**B.** **The district court did not err in concluding that the cancellation of appellant's license did not violate the Americans with Disabilities Act.**

Appellant asserts that the cancellation of his license under Minn. Stat. § 171.09 violates the Americans with Disabilities Act (ADA). While the district court did not explicitly refer to the doctrine of res judicata in dismissing appellant's claim under the ADA, it is clear that it applied those principles. "The doctrine of res judicata bars a claim where litigation on a prior claim involved the same cause of action, where there was a judgment on the merits, and where the claim involved the same parties or their privies." *Wilson v. Comm'r of Revenue*, 619 N.W.2d 194, 198 (Minn. 2000).

Here, appellant's state court claim under the ADA involved the same issues and parties as his federal claim, the federal court rendered a final judgment on the merits, and appellant had the opportunity to fully litigate his claim in federal court. Appellant's federal claim was dismissed by the federal district court, and that dismissal was affirmed by the Court of Appeals for the Eighth Circuit on appeal. *Scheffler v. Dohman*, 785 F.3d 1260 (8th Cir. 2015). Thus, the district court properly dismissed appellant's identical state court claim. *Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn.2004) (noting that fundamental to the doctrine of res judicata is the idea that "a right, question[,] or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties") (quotations omitted).

**Affirmed.**