STATE of Minnesota, Appellant,

v.

Earl Harold MILLER, Respondent.

No. C6–02–1582.

Court of Appeals of Minnesota.

April 15, 2003.

Mike Hatch, Attorney General, St. Paul, Thomas J. Harbinson, Scott County Attorney, Jason W. Eldridge, Assistant County Attorney, Shakopee, for appellant.

Mark D. Nyvold, St. Paul, for respondent.

Considered and decided by
SHUMAKER, Presiding Judge, and
RANDALL, Judge, and WRIGHT, Judge.

## OPINION

RANDALL, Judge.

Appellant State of Minnesota seeks review of the district court's suppression of drugs found in a car where respondent was a passenger and also respondent's custodial statements made to police officers. Because appellant has failed to show that the district court clearly and unequivocally erred, we affirm.

## FACTS

In the past, an informant alerted the Jordan Police Department (JPD) to drug activity at a residence. Based on this informant's tip, JPD obtained and executed a search warrant on the home. No drugs were found. Some months later, this informant called and again reported that the homeowner had a large brick of "crank" (slang for methamphetamine) that he was planning to distribute to several drug dealers. JPD generally, and Chief Malz specifically, initiated surveillance on the home and saw several people approach the homeowner, speak with him a short time, and then leave. Malz saw two men leave the home in a pickup truck.

Malz called Officer Brian Stolt and told him to stop the pickup if he could find any legal reason to do so. Stolt pulled the pickup over, believing that he saw a windshield severely cracked and, thus, obstructing the driver's view. Once Stolt had pulled the pickup over, Malz pulled up behind Stolt's patrol car.

Christopher Klug was driving the pickup truck, and respondent was his passenger. According to the officers, respondent was incoherent, did not pay attention when spoken to, did not respond when asked questions, and had glassy eyes. Malz ordered Stolt to use his drug-detection dog, Radar, to search for the presence of drugs. Stolt did so, moving Radar along the exterior of the vehicle. When he was near the passenger's door, Radar indicated drugs were present. The officers then removed Klug and respondent from the vehicle and searched it, eventually finding a pouch containing methamphetamine under the lining of the front passenger seat. Klug was

questioned and released. Respondent was handcuffed and placed in the back of a police car. While in the police car, Malz started a conversation with respondent. Malz again spoke with respondent at the jail before he gave respondent his Miranda warning and then, after reading respondent his Miranda rights, took respondent's taped confession.

The district court concluded that the decision to use Radar to look for drugs was made before Stolt stopped the vehicle. The court stated "[t]his Court does not find it probable that [Stolt's observations] [were] the real motivating reason for conducting the dog sniff procedures." The court based this on Malz directing Stolt to find a reason to pull the pickup over and concluded that the dog sniff was nothing more than a "fishing expedition." The court also determined that respondent's statements while in the back of the police car should be suppressed because no Miranda warning was given.

### ISSUES

1. Did the police have a reasonable, articulable suspicion of drug-related activity prior to conducting the search of the vehicle using the drug-detection dog?

2. Were respondent's statements before being advised of his Miranda rights properly suppressed?

3. Does a passenger in an automobile have standing to challenge the constitutionality of his detention and the search of that automobile?

### ANALYSIS

**I. Canine Detection**

■ On appeal from a pretrial order, the district court's decision will not be reversed unless it has a critical impact on the prosecution and it is *"clearly and unequivocally"* erroneous. *State v. Webber,*

262 N.W.2d 157, 159 (Minn.1977) (emphasis added). "Critical impact is met when the suppression of the evidence significantly reduces the likelihood of a successful prosecution." *In re Welfare of L.E.P.*, 594 N.W.2d 163, 168 (Minn.1999) (citation omitted). Appellant has met the first prong; it is clear that the likelihood of conviction of possession of drugs is significantly reduced without the drugs. The more significant question is whether the district court's suppression of the drugs was clearly and unequivocally erroneous.

■ Stolt observed that Klug's truck had a cracked windshield. Because it was based on an equipment violation, the stop itself was proper. *State v. Battleson,* 567 N.W.2d 69, 71 (Minn.App.1997) (stating "if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle") (quotation omitted). However, the fact that the stop was lawful does not automatically legitimize a search by a canine. As the district court noted, "the reasonableness requirement of the Fourth amendment is not only concerned with the duration of a detention, but also with its scope." A canine sniff has absolutely nothing to do with an equipment violation. Radar was not sniffing the windshield to determine if it was cracked; instead, he was searching for drugs. Radar's use cannot be justified by the equipment violation.

■ The Minnesota Supreme Court recently determined it is necessary to have a reasonable, articulable suspicion of drug-related criminal activity before law enforcement may conduct a dog sniff around a motor vehicle stopped for a routine equipment violation in an attempt to detect the presence of narcotics.

*State v. Wiegand,* 645 N.W.2d 125, 135 (Minn.2002). Thus, we must decide wheth-

er a reasonable, articulable suspicion existed that there was drug-related activity here.

The district court specifically stated that it did not believe Stolt's testimony that his observations led him to believe respondent was under the influence of drugs, stating "this Court does not find it probable that this information was the real motivating reason for conducting the dog sniff procedures." The court based this on Malz's instruction to find "any reason" to pull the car over. Additionally, the court noted that Stolt did not even speak with respondent, but rather, observed him by looking at him through the driver's window while speaking with Klug. The court noted other possibilities for respondent's behavior and appearance, such as fatigue, alcohol use, or prescription-drug use. Because the officers did not investigate any of these possibilities, but immediately "called in the dog," the court concluded that the canine sniff was not based on a reasonable, articulable suspicion of drug-related activity.

Appellant cites six factors that it claims show a reasonable, articulable suspicion existed: (1) respondent had just left a known drug house; (2) respondent did not respond when spoken to; (3) respondent's eyes were glassy; (4) respondent's actions were "lethargic"; (5) both officers had experience with people under the influence of drugs and not just under the influence of alcohol; and (6) Malz had experience and specific training in dealing with people under the influence of drugs and not just alcohol.

■ Because the weight and believability of witness testimony is an issue for the district court, we defer to that court's credibility determinations. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988); *State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992), *aff'd*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Given this, the factors cited by appellant are insufficient to show the district court unequivocally erred. This "known drug house" contained no drugs last time JPD, acting on the same informant's tip, searched the home. In addition, "merely speaking with and being in close proximity with others suspected of criminal activity, without more, may be insufficient * * * to reach the threshold of reasonable articulable suspicion." *State v. Ingram*, 570 N.W.2d 173, 177 (Minn.App.1997), *review denied* (Minn. Dec. 22, 1997). Malz testified that he had not witnessed either Klug or respondent go into the house or receive anything from the homeowner. Malz testified that he saw something "shiny" in respondent's and Klug's hands as they left, but he admitted he did not know what it was. Whatever he saw, he did not even note this observation in his police report. After an exhaustive search of the vehicle, the police determined these suspicious objects were Burger King hamburgers! We can only speculate as to cheese and/or onions.

The second, third, and fourth factors cited all could be used to show prescription drug abuse, alcohol use (permissible by a passenger in a vehicle), or merely fatigue. Another explanation was that respondent simply did not want to talk with the police, which is his right. The fifth factor is not convincing because it is merely the conclusion drawn from the previous three. Stolt testified that after he obtained Klug's license, he went back to his squad car to talk with Malz. He testified that Malz instructed him to take Radar to sniff the vehicle. Malz testimony of the events was different. He testified that both officers approached the vehicle and questioned the occupants, and only *then* did Malz decide that respondent was impaired, and Radar's use was justified.

The inconsistent accounts of how the decision to search the car was made sup-

port the district court's conclusion that the dog-sniff was not based on the observations of the officers, but rather, was predetermined when Malz told Stolt to find any reason to pull the vehicle over.

In sum, we conclude, as did the district court, that the JPD did not have a reasonable, articulable suspicion that either Klug or respondent was involved in drug-related or, for that matter, any criminal activity. All that Malz knew was that both men were at the house, which, despite appellant's characterization as a "known drug house," did not contain any drugs last time JPD searched it. The district court heard all the testimony and made credibility determinations, choosing to disregard the officers' claimed reasons for the search.

Because the canine sniff was not based on a reasonable, articulable suspicion of criminal activity, or, at its very best was questionable, appellant has not met the high burden of showing the district court's suppression order was unequivocally erroneous.

## II. Custodial Interrogation

The district court suppressed statements made by respondent after he was handcuffed and placed in the squad car on the night of the stop. The district court concluded that respondent was in custody because he was deprived of freedom of action in a significant way.

On appeal from a pretrial order, the district court's decision may not be reversed unless it has a critical impact on the prosecution and it is clearly and unequivocally erroneous. *Webber*, 262 N.W.2d at 159.

■ Appellant asserts that suppression of the drugs has a critical impact on its case. "Critical impact is met when the suppression of the evidence significantly reduces the likelihood of a successful pros-

ecution." *L.E.P.*, 594 N.W.2d at 168 (citation omitted). Essentially, respondent's statements were a confession. If suppressed, a confession "normally will significantly reduce the likelihood of a successful prosecution." *State v. Ronnebaum*, 449 N.W.2d 722, 724 (Minn.1990). Assuming critical impact is met, we move to the merits of the district court's decision.

■ Appellant argues that even though respondent was in custody, no interrogation occurred. In its brief, appellant characterizes respondent's statement as "spontaneous." The court's analysis focuses on custody. While custody is an essential element of the Miranda analysis, custody, by itself, does not require a Miranda warning; instead, it is only when custodial *interrogation* occurs that a Miranda warning is required. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The United States Supreme Court discussed the scope of the interrogation requirement in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). There, the Court said:

> The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.[FN 3]
>
> [FN 3] To limit the ambit of *Miranda* to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda*.'

*Innis*, 446 U.S. at 299, 100 S.Ct. at 1689 (quotations omitted). The Court then stated:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning *or its functional equivalent*. That is to say, the term *"interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police* (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response* [FN 5] *from the suspect.* The latter portion of this definition focuses *primarily upon the perceptions of the suspect, rather than the intent of the police.*

> [FN 5] By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial.

*Id.* at 300–301, 100 S.Ct. at 1689–90 (emphasis added).

Given this definition, it is clear that the district court concluded that respondent's statements were made in respond to interrogation by Malz. Malz's testimony regarding the conversation is as follows:

Q: *And who spoke first?*

A: *I believe I did.*

Q: And what did you say?

A: I don't know how the conversation went. * * * *I at one point I just stopped and I said, "Did Lara bring the drugs out to you or did you go into his house and get them?" And then he told me that Lara had gone into the house and had gotten the drugs for him but that he felt it was just a diversionary thing.*

Q: *Was he under Miranda at that time?*

A: *No he was not.*

Respondent's testimony of the conversation was as follows:

Q: While you were in the back of the squad did anybody come up to talk to you?

A: Officer Malz, Chief Malz.

Q: Tell us what happened?

A: He asked me, said we had methamphetamines in the truck and he told me that it was mentioned about Geronimo Lara, he wanted Lara. And he asked if I sign a warrant on Lara, that he'd let me go, if I sign the warrant he said he had to take me down to the police station for me to sign this warrant.

For purposes of analysis, we accept Malz's version of the conversation. *"Did Lara bring the drugs out to you or did you go into his house and get them?"* can, without offending anybody, be interpreted as direct interrogation of respondent with a question likely to elicit an incriminating response. Malz's interrogation worked. This question did elicit an incriminating response. Respondent was being arrested for possession of drugs. Malz got him to state that Lara had gone into the house to get the drugs. This incriminates respondent because it is solid evidence as to how he obtained illegal drugs. The district court's analysis under Miranda is sound. Appellant has failed to show clear and unequivocal error.

■ Coupled with the Miranda analysis, respondent's statements are suppressed as the fruit of the poisonous tree based on the illegal search under *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In that case, the court held because there is a causal connection between an illegal arrest and confession, custodial statements that stemmed from an illegal arrest are not rendered

admissible merely because defendant had been given Miranda warnings prior to making statements. *Id.* at 605, 95 S.Ct. at 2262–63. Discussing the factors to consider in determining when an illegal arrest and in-custody statements are connected, the Court stated:

> The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (citations omitted). In this case, the arrest and interrogation were temporally close and the only purpose Malz had in speaking with respondent was to elicit incriminating statements. Having determined that the search itself was unlawful, respondent's statements are suppressed on this ground as well.

### III. Standing

■ Appellant argues that, regardless of the merits, respondent does not have standing to object to the search of the vehicle because he was only a temporary passenger and that to have standing to object to a search, a passenger must have (1) an expectation of privacy; and (2) dominion, control, and the right to exclude others relative to the area searched.

We have held that a passenger in the car had standing to contest the constitutionality of the stop. *State v. Ritchie,* 379 N.W.2d 550, 553 (Minn.App.1985), *review denied,* (Minn. Feb. 14, 1986). Further we stated, "[the passenger] had a protectible Fourth Amendment interest in not being stopped unless the police officers were able to justify the stop based on the standards." *Id.* at 552. In *Ritchie,* we concluded that the search was lawful because it was based on a reasonable, articulable suspicion of criminal activity. *Id.* at 553.

■ As the *Ritchie* court noted, "[A] brief stop is considered a seizure and an individual who is stopped is entitled to Fourth Amendment protection, even though the standards justifying a stop are lower than for arrest." *Id.* at 553 (citing *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). Respondent does not challenge the constitutionality of the stop of the vehicle; instead, he challenges the search with the drug-detection dog and his continued detention as unrelated to the initial stop. On these facts, because respondent was stopped and detained, he has standing to question the constitutionality of the search.

### DECISION

Appellant failed to show that the district court unequivocally erred by suppressing evidence of the drugs and respondent's custodial statements.

**Affirmed.**