*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0412**

State of Minnesota,
Respondent,

vs.

Randall Thomas Graham,
Appellant.

**Filed November 27, 2023**
**Affirmed**
**Larkin, Judge**

Stearns County District Court
File No. 73-CR-19-9380

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Renee N. Courtney, St. Cloud City Attorney, James P.A. Morrighan, Assistant City Attorney, St. Cloud, Minnesota (for respondent)

Greg A. Engel, St. Cloud, Minnesota (for appellant)

    Considered and decided by Larkin, Presiding Judge; Wheelock, Judge; and Kirk, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**LARKIN**, Judge

Appellant challenges his conviction of driving while impaired (DWI), arguing that the district court erred by denying his motion to suppress evidence of the offense and his motion to dismiss based on a due-process violation. We affirm.

## FACTS

Respondent State of Minnesota charged appellant Randall Thomas Graham with two counts of second-degree DWI. Graham moved the district court to suppress the evidence against him, arguing that the evidence was obtained as the result of an illegal seizure. The district court held an omnibus hearing on Graham's motion and heard testimony from Officer Louis Etshokin, Officer Brent Fandel, Graham, and Graham's passenger.

Evidence at the hearing established that on November 3, 2019, at around midnight, Officer Fandel was dispatched to the La Playette Bar in St. Joseph to investigate a report of an intoxicated driver. The suspect vehicle was described as a white Dodge Ram. At that same time, Officer Etshokin was on routine patrol and heard Officer Fandel advise that he was investigating the report.

Officer Fandel arrived at the bar and met with the reporting party, a bouncer, who stated that Graham had stumbled before entering the bar. Officer Fandel saw Graham seated at the bar approximately 20 feet away having an alcoholic beverage. Graham did not appear to be intoxicated. Officer Fandel did not investigate further because he did not think that Graham was committing a crime.

2

Not long after, Officer Etshokin saw the Dodge Ram parked near the La Playette Bar and recognized the vehicle from the earlier dispatch report. At approximately 12:50 a.m., Officer Etshokin saw the Dodge Ram being driven in St. Joseph and followed it. Officer Etshokin was looking for signs of impaired driving. He saw the vehicle cross the fog line, make a "sloppy" right turn, and cross into oncoming traffic before correcting into the proper lane. Officer Etshokin initiated a traffic stop.

Officer Etshokin approached the vehicle and made contact with Graham, who was driving. Before stopping Graham's vehicle, Officer Etshokin advised Officer Fandel that he was behind the suspect vehicle from the earlier report from the La Playette Bar. Within two minutes of initiating the traffic stop, Officer Fandel arrived to relieve Officer Etshokin, who turned the investigation over to Officer Fandel and left to respond to a medical-emergency call. During Officer Fandel's interactions with Graham, he observed indicia of intoxication and arrested him for DWI. Chemical testing revealed that Graham had a breath-alcohol concentration of 0.18.

Officer Etshokin testified that his squad car's video system automatically activates when an officer turns on the vehicle's emergency lights, and the captured footage will often include a few minutes of video prior to the activation of the lights. Officer Etshokin testified that he believed Graham's driving conduct was automatically recorded by the squad camera.

At the hearing on his suppression motion, Graham testified that he did not cross the fog line or make a wide turn. He testified that his Dodge Ram has "all the bells and whistles," including "lane departure," and that it therefore "cannot cross the fog line."

3

After the hearing, Graham's attorney requested Officer Etshokin's squad video and asked that the record be kept open because he was not aware of the video until he heard Officer Etshokin's testimony. The district court directed the state to request a copy of the video and provide it to Graham. The state later informed the district court that the squad video did not exist and requested that the record be closed.

The district court denied Graham's suppression motion. The court credited Officer Etshokin's testimony that Graham swerved over the fog line and made a wide turn into oncoming traffic. The district court concluded that the observed traffic violation provided a lawful basis to stop Graham's vehicle.

Following the district court's ruling, Graham requested disclosures from the state regarding the St. Joseph Police Department's video retention policies. Police Chief Dwight Pfannenstein responded with a letter stating:

- I am the only one in the department that has the password that allows any deleting or modification of the camera system or its files.
- We do not currently have a policy on how long we retain footage. *We currently do not delete videos from the following calls or "Event tag."* We have all footage from all of our Domestics, DUIs, Traffic Citations, Traffic Accidents, Assaults, Drug Seizure, Evading, Motorist Assist, Suspicious Behavior, *Medical*, Burglary, Robbery, Alcohol, Open Door, Alarm, Loud Music, Other, and Agency Assist.
- The only two event tags not listed above, that get cleared out, are: test recording and traffic warning that are over one year old.
- I have been made aware that Officer . . . Etshokin has put in his report that he had squad video. The video doesn't exist. Either the event did not record as the officer thought it did or perhaps it got tagged wrong as a test recording or a traffic warning and was deleted

4

after one year. I do not view each traffic warning and test recording events as there are thousands of them per year before they are deleted. If this video somehow got coded as one of these events, it would be deleted by now.

(Emphasis added.)

Chief Pfannenstein sent Graham's counsel a second letter stating:

- As stated in the previous letter, to the best of my knowledge, neither myself or the [s]ergeants viewed any video from Officer Etshokin on this incident. It is assumed the video was coded incorrectly and deleted. When deleted, it would have been done by [me].
- The St. Joseph Police Department does not keep logs of when video is taken from the squad car and transferred to storage. Due to the assumption this video was coded incorrectly, we are unable to determine a date of deletion. This information would have been deleted a year after the incident, since no requests or complaints were filed for this information. *It was discovered after the initial information was sent to your office, that medicals 2019 and older were in fact deleted.* The most current medical in video storage is from February 1, 2020.
- [I]t is the belief that Officer Etshokin continued his squad video from this incident into the medical call and most likely labeled it a medical.

(Emphasis added.)

Graham moved the district court to dismiss the charges, arguing that the loss or destruction of the squad video constituted a due-process violation. The district court held a second omnibus hearing and received testimony from Officer Etshokin, Chief Pfannenstein, and Graham.

Officer Etshokin testified that he first learned that the video was missing just prior to the initial omnibus hearing. When asked how the video was saved, he responded, "There

5

is a memory stick system which the sergeants will take out of the squad and bring into the police office and transfer it over to a master computer system." Officer Etshokin testified that his only role in ensuring that the video is properly saved is to label the video with the appropriate description type, for example, "traffic stop." He testified, "I know that there was a recording made, because I reviewed it when I wrote my report," but "I cannot swear if I saved it under medical or under traffic."

Officer Etshokin explained that he was called to a medical call during the traffic stop. He testified that his emergency lights remained activated as he traveled to the medical call, that it was possible that he labeled the video as a medical call because he "went from the traffic stop to the medical uninterrupted," that he believed videos from medical calls are "saved forever," and that he did not delete the video of the stop and had no authority or knowledge regarding how to delete such videos.

Chief Pfannenstein testified that he oversees the sergeants assigned to managing, transferring, and storing videos; that he searched for and could not locate the video recording of Graham's traffic stop; and that all recordings labeled as medical calls were "deleted for 2019 to free up some space on our server." He testified that "it's to the point where test recordings, traffic warnings and medicals take up a lot of space on our internal storage, and it's my belief that after a year or two if there haven't been any complaints" then "we just delete them," and that "[t]he only person in our department that has the password to remove the files [is] myself." He testified, "I might have deleted it if it was labeled as a test recording, as a medical or as a traffic warning."

6

The district court denied Graham's motion to dismiss, reasoning that there was "an equal likelihood the squad video could have inculpated [Graham] as it could have exculpated him." The district court determined that the squad video was not destroyed in bad faith, that the exculpatory value of the evidence was not apparent "at the time of destruction," and that Graham could obtain evidence of comparable value elsewhere.

Graham waived his right to a jury trial and stipulated to the prosecution's case, under Minn. R. Crim. P. 26.01, subd. 4, to obtain appellate review of the district court's pretrial rulings. The district court found Graham guilty of both counts of DWI and entered judgment of conviction on one count.

Graham appeals.

## DECISION

### I.

Graham contends that the district court erred by denying his motion to suppress, arguing that his seizure was unconstitutional.

Evidence seized in violation of the U.S. or Minnesota constitutions must be suppressed. *Terry v. Ohio*, 392 U.S. 1, 12-13 (1968); *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011). The Fourth Amendment of the U.S. Constitution and article I, section 10, of the Minnesota Constitution protect "against unreasonable searches and seizures." Warrantless searches and seizures are per se unreasonable unless they fall under an established exception. *State v. Othoudt*, 482 N.W.2d 218, 221-22 (Minn. 1992).

A police officer may temporarily detain an individual based on reasonable, articulable suspicion that the individual is engaged in criminal activity. *Diede*, 795 N.W.2d

7

at 842-43. Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle. *See, e.g.*, *State v. Pleas*, 329 N.W.2d 329, 332-33 (Minn. 1983); *State v. Barber*, 241 N.W.2d 476, 477 (Minn. 1976). The Minnesota Supreme Court has adopted "the principles and framework of *Terry* for evaluating the reasonableness of seizures during traffic stops even when a minor law has been violated." *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004).

When assessing the validity of an investigative seizure, a court considers two issues: whether the seizure was justified at its inception, and whether the actions of the police during the seizure were "reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *Id.* at 364.

> The second *Terry* prong constrains the scope and methods of a search or seizure. An initially valid stop may become invalid if it becomes intolerable in its intensity or scope. Thus, each incremental intrusion during a stop must be strictly tied to and justified by the circumstances which rendered the initiation of the stop permissible. An intrusion not closely related to the initial justification for the search or seizure is invalid under article I, section 10 unless there is independent probable cause or reasonableness to justify that particular intrusion.

*Id.* (citations and quotations omitted). "[A]n extension of the duration of a stop beyond the time necessary to effectuate the purposes of the stop is unreasonable." *Id.* at 371.

"When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999). We review the district court's factual findings for clear error and its legal

8

determinations de novo. *State v. Ortega*, 770 N.W.2d 145, 149 (Minn. 2009). In reviewing the district court's factual findings, we defer to the district court's credibility determinations. *State v. Jones*, 566 N.W.2d 317, 325 (Minn. 1997); *State v. Miller*, 659 N.W.2d 275, 279 (Minn. App. 2003), *rev. denied* (Minn. July 15, 2003).

*Credibility Determination*

In challenging the district court's ruling, Graham argues that the district court erred by determining that Officer Etshokin's testimony that Graham's vehicle crossed over the fog line and made a wide turn was more credible than Graham's testimony denying those violations, given "the undisputed facts, suspicious circumstances and inferences related to Officer Etshokin's missing squad car video." Graham acknowledges that we generally defer to a district court's credibility determinations, but he argues that Officer Etshokin was not credible because his squad video was not retained and Chief Pfannenstein made inconsistent statements regarding which videos are retained.

The district court expressly found Officer Etshokin's testimony credible. We discern no basis to disregard that credibility determination. *See State v. Hurd*, 819 N.W.2d 591, 598 (Minn. 2012) (stating that the fact-finder "is in the best position to weigh credibility and thus determines which witnesses to believe and how much weight to give their testimony" (quotation omitted)).

*Reasonable, Articulable Suspicion*

Graham does not argue that Officer Etshokin's observation of Graham's traffic violation—if credited—did not establish a basis for a traffic stop. Instead, he argues that the officers unlawfully expanded the traffic stop to include a DWI investigation. We

9

review de novo whether an officer had reasonable suspicion of criminal activity to justify a seizure. *Diede*, 795 N.W.2d at 843; *State v. Lugo*, 887 N.W.2d 476, 487 (Minn. 2016). We apply an objective test: "would the facts available to the officer at the moment of the seizure warrant a man of reasonable caution in the belief that the action taken was appropriate." *Askerooth*, 681 N.W.2d at 364 (quotations omitted). In doing so, we consider the totality of the circumstances. *State v. Taylor*, 965 N.W.2d 747, 752 (Minn. 2021).

Because we review the district court's legal determination regarding reasonable suspicion de novo, we are not bound by the district court's legal reasoning. *See State v. Fellegy*, 819 N.W.2d 700, 707 (Minn. App. 2012) ("We may affirm the district court on any ground, including one not relied on by the district court."), *rev. denied* (Minn. Oct. 16, 2012). In addition, "it is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities." *State v. Hannuksela*, 452 N.W.2d 668, 673 n.7 (Minn. 1990) (quotation omitted).

Although not cited by the district court or the parties, the facts of this case bring it squarely within well-established caselaw holding that a reliable tip from a citizen informant may provide the requisite reasonable, articulable suspicion for a seizure to investigate a suspected DWI offense.

For example, in *Marben v. State, Department of Public Safety*, a trooper received a radio communication from an unidentified trucker, who said that he could see the trooper's squad car and asked the trooper to investigate a car that had been tailgating him for many

miles. 294 N.W.2d 697, 698 (Minn. 1980). The trooper pursued the suspect vehicle, and although the trooper did not observe any traffic violations, he stopped the vehicle. *Id.* The trooper arrested the driver for DWI after he observed indicia of intoxication. *Id.* The supreme court upheld the stop, stating that, because the trucker was a private citizen, his reliability could be presumed, and his claim of tailgating provided a basis to initiate a stop for a traffic violation. *Id.* at 699.

However, in *Olson v. Commissioner of Public Safety*, the supreme court held that a citizen's tip lacked sufficient indicia of reliability to support a DWI stop. 371 N.W.2d 552, 553 (Minn. 1985). A citizen reported that the driver of a vehicle was possibly intoxicated. *Id.* Officers located the vehicle and stopped it, despite observing no traffic violations. *Id.* The supreme court stated that whether the stop was valid depended on "whether the dispatcher, who issued the message to the deputies, was in possession of specific and articulable facts supporting a reasonable suspicion that there was a drunk driver on the road." *Id.* at 555. In differentiating the case from *Marben*, the supreme court stated, "[W]e know nothing about the informant and nothing about what the informant saw which led him or her to believe the [vehicle's] driver was 'possibly' drunk." *Id.* at 556. The supreme court noted, "[T]he observance of erratic driving by the officer would have adequately corroborated the anonymous tip and justified an investigative stop." *Id.*

Later, in *State v. Richardson*, the supreme court held that "[a] police officer who, after receiving a police radio dispatch relaying a motorist's report that a motor vehicle was being driven erratically, observed the same vehicle cross and recross the fog line, possessed

11

an objective basis for reasonable suspicion warranting an investigative stop." 622 N.W.2d 823, 824 (Minn. 2001). The supreme court explained its reasoning as follows:

> In this case, the police officer saw an oncoming vehicle cross and recross the fog line after he had been apprised by a radio report that the same vehicle had been reported to be driving "all over the road." *This combination of the officer's own observations, together with information received in the police dispatch, was sufficient to give the officer a particularized and objective basis for suspecting the driver of criminal activity.* Erratic driving of the type observed by the officer and reported by the motorist could reasonably indicate violation of any of a number of Minnesota statutes. *E.g.*, . . . Minn. Stat. § 169A.20, subd. 1(1) (2000) (operating a vehicle under the influence of alcohol).

*Id.* at 825-26 (emphasis added). The supreme court distinguished *Olson*, saying that in *Olson*:

> [T]he police did not observe any erratic driving before they stopped the vehicle, and were acting solely on the unidentified motorist's tip. In contrast, here *the officer's independent observation of erratic driving forms part of the totality of the circumstances to which we look for justification of the stop.*

*Id.* at 826 (emphasis added).

In this case, the tipster was a known citizen. The tipster reported an intoxicated driver. The tipster described the vehicle and pointed the driver out to Officer Fandel when he arrived at the bar. The tip was communicated to Officer Etshokin, who drove to the bar and observed a parked vehicle that matched the suspect-vehicle description provided by the tipster.

At approximately 12:50 a.m., Officer Etshokin saw the suspect vehicle being driven in St. Joseph and followed it. Officer Etshokin was looking for signs of impaired driving

12

as he followed the vehicle, and he observed them. He saw the vehicle's driver cross the fog line, make a "sloppy" right turn, and cross into oncoming traffic before correcting into the proper lane. Those observations corroborated the tipster's earlier report that the vehicle's driver was intoxicated. Under the totality of the circumstances—including the time of day—a reasonable officer in Officer Etshokin's position would have reasonably suspected that the driver was intoxicated. *See id.* at 825 (concluding that "the officer's own observations, together with information received in the police dispatch, was sufficient to give the officer a particularized and objective basis for suspecting the driver of criminal activity"); *State v. Lande*, 350 N.W.2d 355, 357-58 (Minn. 1984) (indicating that time of day is a relevant consideration in determining whether reasonable suspicion existed); *Otto v. Comm'r of Pub. Safety*, 924 N.W.2d 658, 661 (Minn. App. 2019) (considering 1:20 a.m. on a Saturday morning to be a "time of day when drinking is often found to be involved").

The district court relied on the collective-knowledge doctrine to uphold the stop. That doctrine imputes the entire knowledge of the police force to the arresting officer. *State v. Conaway*, 319 N.W.2d 35, 40 (Minn. 1982). Graham argues that the district court misapplied the doctrine and that Officer Fandel's observation of Graham drinking alcohol in the bar cannot be used as grounds for Officer Etshokin's "expansion" of the traffic stop to include a DWI investigation because Officer Fandel never communicated that information to Officer Etshokin. That argument is rendered immaterial by our conclusion that Officer Etshokin's knowledge of the tipster's report of an impaired driver and his first-hand observation of traffic violations that corroborated the tip provided reasonable, articulable suspicion of DWI.

For the same reason, we reject Graham's argument that the police unlawfully "expanded" Graham's investigative seizure from a "regular traffic stop" to a DWI investigation by calling Officer Fandel to the scene and turning over the investigation to him. *See Askerooth*, 681 N.W.2d at 364 (stating that each incremental intrusion during a stop must be justified by the circumstances that rendered the stop permissible). Graham's seizure was not "expanded" to include investigation of a DWI offense. Instead, Graham's seizure was based on reasonable, articulable suspicion of a DWI offense. Thus, the scope of the stop did not impermissibly expand beyond the original justification for the stop. *See State v. Smith*, 814 N.W.2d 346, 351 (Minn. 2012) ("When considering whether a traffic stop violated a person's right to be free from unreasonable searches and seizures . . . we first determine whether the officers expanded the duration or scope of the stop beyond the stop's original justification.").

Finally, we are not persuaded by Graham's assertion that the two- to three-minute delay while Officer Etshokin waited for Officer Fandel to arrive was constitutionally unreasonable. Although there is no rigid time limit on the length of an investigative detention, "it is clear that the brevity of the invasion . . . is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (quotation omitted). The Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* As long as the reasonable suspicion for the detention remains, the police may continue the detention provided that they act diligently and reasonably. *Id.* at 687. In *State v. Moffatt*,

14

the supreme court found that detaining a suspect for one hour in a squad car was reasonable when officers reasonably and diligently pursued their investigation. 450 N.W.2d 116, 118-19 (Minn. 1990).

Officer Etshokin testified that he turned Graham's DWI investigation over to Officer Fandel and left to respond to a medical emergency "[b]ecause [Officer Fandel] is more experienced at DWI's than I am, he is there full time [and] able to do follow-ups on any cases he's involved in, and I'm part time and I'm not real good at DWI's." That approach and the resulting two- to three-minute delay were reasonable and diligent.

In sum, the combination of Officer Etshokin's observations—including his observation of the suspect vehicle parked at a bar and the later traffic violations—together with information received in the police dispatch indicating that the suspect vehicle's driver was intoxicated, was sufficient to give the officer a particularized and objective basis to suspect the driver of DWI. Thus, Graham's seizure for the purpose of investigating the DWI offense was constitutionally valid. Although the district court used a different analytical approach, it correctly determined that Graham's investigative seizure was lawful and did not err by denying Graham's motion to suppress.

**II.**

Graham contends that the district court erred by determining that the state's failure to preserve Officer Etshokin's squad video did not violate Graham's right to due process.

In a criminal case, the state must disclose any evidence within its possession or control that "tends to negate or reduce the defendant's guilt." Minn. R. Crim. P. 9.01, subd. 1(6). In *Brady v. Maryland*, the Supreme Court held "that the suppression by the

15

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Thus, "[u]nder *Brady*, the suppression by the [s]tate, whether intentional or not, of material evidence favorable to the defendant violates the constitutional guarantee of due process." *Walen v. State*, 777 N.W.2d 213, 216 (Minn. 2010).

The three elements of a *Brady* violation are: "(1) the evidence must be favorable to the defendant because it would have been either exculpatory or impeaching; (2) the evidence must have been suppressed by the prosecution, intentionally or otherwise; and (3) the evidence must be material—in other words, the absence of the evidence must have caused prejudice to the defendant." *Id.* If evidence that is only potentially useful to a defendant is destroyed, then the defendant must show bad faith on the part of the state to establish a due-process violation. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Whether a due-process violation occurred is a question of law, subject to de novo review. *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012).

"Evidence is material under *Brady* if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Walen*, 777 N.W.2d at 216 (quotation omitted). "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Id.* (quotations omitted). "Accordingly, a new trial is not required simply because a defendant uncovers previously undisclosed evidence that would have been possibly useful to the defendant but unlikely to have changed the verdict." *Id.*

16

The district court reasoned that the video was not material because there was an equal likelihood that the video was inculpatory, and not exculpatory. As the district court explained:

> [Graham] argues the video would have exonerated him as his vehicle is equipped with a lane assistance feature which would have prevented him from crossing over the fog line. However, [Graham] also testified he could not provide expert testimony as to how the safety feature worked nor did he testify that the feature had been engaged on the date of the stop. Instead, [Graham] merely testified that he had been informed of the feature's existence by a salesperson when he initially purchased the vehicle. That said, a question remains as to why such a safety feature would have activated in the first place had [Graham] been driving in a straight line as [he] had stated. Further, the [c]ourt considers [Graham's] conduct prior to and after his vehicle had been stopped. Officers were initially made aware of [Graham] by a bouncer at the La Playette bar specifically for his poor driving conduct and stumbling demeanor. The [c]ourt finds significant the fact that [Graham] had been observed drinking alcohol in a bar by officers prior to the stop. The [c]ourt also considers [Officer] Fandel's testimony that he had observed multiple signs of impairment from [Graham] as well as [Graham's] breath alcohol content.

(Emphasis added; footnote omitted.)

The district court's reasoning is sound, and we agree that the video was not "material." There must be something beyond mere "hope" that the destroyed evidence could be exculpatory before it will be protected as the type of "material exculpatory evidence addressed in *Brady*." *Illinois v. Fisher*, 540 U.S. 544, 548 (2004).

Because the video was not material and was only "potentially useful," Graham must show bad faith on the part of the state to succeed on his due-process claim. *Youngblood*, 488 U.S. at 58; *State v. Hawkinson*, 829 N.W.2d 367, 373 (Minn. 2013). The United States

17

Supreme Court and the Minnesota Supreme Court have identified two indices of bad faith: (1) the state's purposeful destruction of evidence favorable to a defendant so as to conceal it; and (2) the state's failure to follow standard procedures when destroying evidence. *Hawkinson*, 829 N.W.2d at 373.

The record does not support a conclusion that the state purposely destroyed the video.[1] The district court expressly found that "while the video may have been destroyed due to mistake or gross negligence, the [c]ourt does not find the video was intentionally destroyed." And the circumstances do not suggest that the state was attempting to conceal the video. In fact, but for Officer Etshokin's testimony at the initial omnibus hearing, which revealed the existence of the video, Graham would not have known about the video. Nor does the record support a conclusion that the state failed to follow standard procedures when it destroyed the video. The record establishes that the St. Joseph Police Department did not have a formal policy governing video retention.

In sum, because the video was not "material" and the record does not show that the video was destroyed in bad faith, the district court did not err by denying Graham's motion to dismiss for a due-process violation.

**Affirmed.**

---

[1] Graham argues that *State v. Schmid* supports his *Brady* claim. 487 N.W.2d 539 (Minn. App. 1992), *rev. denied* (Minn. Sept. 15, 1992). In *Schmid*, this court stated that "[w]hen the police *intentionally* destroy evidence, it is a natural inference that it was destroyed because it may have been exculpatory and, hence, prejudice has been caused to defendant." *Id.* at 542 (emphasis added). *Schmid* is distinguishable because, in that case, an officer intentionally erased the tape at issue after summarizing the contents. *Id.* at 541-42.

18